NORMAN CUTTER, Respondent, v. WILLIAM WADDINGHAM, AND OTHERS, Appellants.*

1. The Spanish law superseded the French law in the district of Illinois (afterwards Upper Louisiana) as early as the year 1777.
2. By the Spanish law prevailing here as early as 1777, persons about to be married could not, by marriage contract, introduce a foreign law, (as for example the French law,) to regulate their property relations as husband and as wife; as by stipulating for the establishment of a community between the parties according to the custom of Paris.
3. A. and B. being about to marry, entered into a marriage contract, dated August 5th, 1777, containing clauses of which the following is a translation: "The said future spouses to be one and common in all moveable property and immoveable *conquests* (en tous biens meubles, et conquets immeubles), according to the ancient custom established in this colony, to which they submit themselves by force of the present contract;" "the said future spouses take each other with the property and rights to them now belonging, and such as may happen to come and belong to them hereafter, whether by succession, gift, legacy or otherwise; which property, from whichever side it may come to them, shall enter wholly into community without any reserve." *Held*, that these clauses were ineffectual to

NOTE.—The importance of this cause, both as regards the amount of value involved, and also the principles established by the decision of the court, is such, that the Reporter has considered himself justified in giving an extended report of the views presented to the court by counsel. The brief of Mr. R. M. Field, filed by him on a motion for a re-hearing, will, it is thought, be of interest to the profession, and it is accordingly printed at large.—[REPORTER.

bring a lot of one by forty arpens of land in the St. Louis prairie, owned by the husband at the time of the marriage, into a conjugal community, in any such sense, that, on the death of the husband, the wife would be entitled to one half thereof.

4. By the Spanish law of succession, which prevailed here prior to September 1st, 1807, brothers of the half-blood would, in the case of an intestacy, be preferred in the succession to paternal aunts, and that, too, although the intestate acquired the property from his father. The Spanish law paid no regard to the quantity of the blood of the intestate in the veins of one claiming to succeed to an estate, except in the case of brothers and sisters of the whole blood and their descendants, who took before, and to the exclusion of, the brothers and sisters of the half-blood; nor did it pay any regard to the line from which the property came, except in the single instance of a deceased brother, leaving both paternal and maternal goods, and half-brothers and sisters on both sides.

5. By the Spanish law of second marriages, a widow, having become such when over the age of twenty-five years, on her second marriage forfeited to the children of the first marriage all the property that she may have acquired from her deceased husband, by a lucrative title, either immediately, or mediately through an intestate succession to a deceased child of the first marriage. Immediately upon the second marriage the title to the property vested in the children, she, however, retaining the usufruct during her life.

6. The 12th section of the territorial act of July 4th, 1807, provided that, " There shall be no distinction in the distribution of any intestate's estate between kindred of the whole or half-blood, unless when the inheritance came to the person so seized, by descent, devise or gift of some one of his or her ancestors; in which case all those who are not *of the blood* of such ancestors shall be excluded from such inheritance." *Held,* 1st, that the words " of the blood" exclude only those who have *none* of the blood of the ancestor from whom the estate came, without reference to proportion or quantity; 2d, that all such as have none of the blood are entirely excluded; as where an estate came direct to the intestate from his father, brothers of the half-blood on the one side of the mother being in that case entirely excluded from the inheritance; 3d, that this exclusion is limited to an exclusion of those who are not of the blood of the immediately antecedent ancestor; as where an estate has passed by descent to two brothers, and upon the death of one brother his half has passed to the other, the intestate, the half-brothers of such intestate on the side of the mother are not excluded from inheriting that portion of the estate that came to the intestate from his deceased brother.

7. Where A. conveys to B. contiguous lots, by separate granting words, descriptions, and habendums, and B. builds a house upon one of the lots, and makes an enclosure about the same, and accidentally, through mistake or ignorance of the boundaries, and without any design of taking possession of it, extends the enclosure over upon the other lot, so as to embrace a small

portion of said lot; *held,* that this is not a possession within the meaning of our statute of limitations ; although the actual detention—*" pedis posses- sio"* — exists ; there is wanting the intention on the part of the possessor, which is necessary to constitute a civil possession.

8. *Quere*—Whether one who has taken possession of a small portion of a large lot or tract of land, under a deed, not of the lot, but merely of whatever interest the grantor may be found to have in it, has, without any thing more, a possession extending over the whole lot, within the meaning of our statute of limitations.

## *Appeal from St. Louis Circuit Court.*

This was an action of ejectment commenced in the St. Louis Circuit Court on the 8th day of August, 1846, by Cutter, the respondent, to recover of Waddingham, appellant, who was tenant under the heirs of John Mullanphy, deceased, a tract of land described in the declaration as follows : " The following described lot or parcel of ground, situated at a place called the Prairie, near St. Louis, or Prairie La Grange de Terre, in said county, being a lot of one arpent, French measure, in width, by forty arpens, like measure, in length, and the same tract in said prairie which was originally granted to one Louis Lirette, and by the said Lirette sold to one John Baptiste Vifvarenne, deceased, being survey numbered 1479, as appears by the records of the office of the surveyor general of Missouri and Illinois."

The heirs of said Mullanphy were made co-defendants with their tenant, Waddingham, and the cause was tried under the common issue, January 4th, 1854. The jury found a verdict for the plaintiff for three hundred and thirteen undivided four hundred and twentieth parts of the land in controversy.

To maintain the issues on his part produced,

1. A concession made by St. Ange and Labuxiere to Louis Lirette, dated July 17th, 1769, and contained in livre terrein No. 1, p. 27. This concession was for " a tract of land situated in the prairie opposite the ' Grange de Terre,' [in the original, " *vis à vis la bute de la grange,"*] containing one arpent in width by forty arpens in depth, bounded on one side by the land of widow Marechal, and on the other by that of Condé."

Cutter v. Waddingham.

2. A survey by Duralde, the Spanish surveyor, taken from livre terrein No. 2, of one by forty arpens, for Louis Lirette, in the prairie adjoining St. Louis. By this survey, which was made between the fall of 1770 and the spring of 1772, the tract surveyed for Lirette was bounded on the one side by the "domain of the king, of 5½ arpens in width," and on the other by Moreau. Duralde's surveys for Moreau and Vien, for the two lots of one by forty arpens each, lying north of Lirette, were also read in evidence. There was also put in evidence a connected plat of Duralde's surveys of the lots in St. Louis common field, a portion of which, representing the locations, as surveyed by Duraldo, of the Vien, Moreau and Lirette arpens, the vacant 5½ arpens, as also the two by forty arpens of Condé, is correctly represented as follows : ·

| | |
|---|---|
| Vien | 1 |
| Moreau | 1 |
| Lirette | 1 |
| Vacante | 5½ |
| Augte. Conde | 2 |

There was no proof offered as to the location of widow Marechal's land.

3. An act of sale executed before lieutenant governor Piernas, August 20th, 1774, by Louis Lirette, by which he conveyed to J. B. Vifvarenne a tract of land described as follows : " One arpent in width and forty arpens in length, situated opposite the foot of the mound, [vis à vis la bute de la grange,] or thereabouts, and joining on one side to the widow Marechal, and on the other side to the domain of the king, or land of Señor Condé ; having been granted to him under the French government by Messrs. the commander and judge of this province, according to the grant which the said Lirette has this day given up to said Vifvarenne."

4. The tabular statement of recorder Bates recommending to

congress for confirmation the claim of Lirette's representatives to the tract of one by forty arpens, surveyed for said Lirette by Duralde as above set forth :

| Warrant order of survey. | Survey. | Notice to the Recor. by whom. | Quantity claimed. | Where situated. | Poss. inhab. or cultivated. | Opinion of the Recorder. |
|---|---|---|---|---|---|---|
| Prov. Land Book, No. 2, p. 29. | Not platted. | Lirette's representatives. | F 167, 1 by 40 arpens. | St. Louis, out lot. | Poss. cultivated prior to 1803. | Confirmed 40 arpens, to be surveyed. |

5. United States survey No. 1479, for Lirette's representatives. This survey was made in 1826, and embraces the land in controversy in the present suit. The description or heading attached to this survey by the deputy surveyor, is as follows :

" Plat and description of the survey of a tract of thirty-four and three-hundredths of an acre, executed by Rene Paul on the 19th October, 1826, under instructions from W. McRae, S. G., it being the tract of 1 by 40 arpens granted to Louis Lirette, 17th July, 1769, by the Spanish authorities of the province of Upper Louisiana, surveyed in the year 1770, 1771 or 1772, by Martin Duralde, in virtue of the power vested in him by the said Spanish authorities, (see livre terrein, No. 1, p. 27, and No. 2, p. 29, in the office of the recorder of land titles,) and confirmed to Lirette's representatives by the act of congress of 29th April, 1816."

6. Recorder Hunt's minutes of testimony, taken in 1825, under the act of May 26, 1824, to ascertain the several lots confirmed to individuals by the act of June 13th, 1812. The depositions of Baptiste Riviere and Rene Dodier, contained in said minutes, were read by plaintiff, showing that Lirette cultivated the lot now in controversy, and that Vifvarenne cultivated a lot of two by forty arpens next north of Condé, and three and a half arpens south of the Lirette arpent. Riviere, in his deposition, says : " This deponent says, of his own knowledge, the persons above named owned the field lots, as above described, and cultivated each of their field lots forty

years ago and upwards, and they continued under cultivation for many years."

7. Plaintiffs read in evidence a deed, dated October 13th, 1819, from Pierre Chouteau and wife to John Mullanphy, and, in connection therewith, showed by John O'Fallon, executor of Mullanphy, that the heirs of said Mullanphy claimed the land in dispute in this suit under that deed as a title paper. This deed embraces the Vien, Moreau and Lirette arpens. The operative words and descriptions in said deed are as follows : " have sold, granted, transferred and released, as by these presents we sell, grant, transfer and release to the said Mr. John Mullanphy, a certain piece of ground, lying and situate to the north of the town of St. Louis, at the place commonly called *the barn of earth*, (the Big Mound,) having two arpens in front by forty arpens in depth, or eighty arpens in surface, bounded on the north by a tract of land belonging to the said John Mullanphy, and on the south by a tract of land formerly granted by the Spanish government to Mr. Louis Lirette, sold by the said Lirette to Mr. Vifarenne, and by the heirs of said Vifarenne to us, the above named vendors ; which said two arpens belong to us, who acquired them as follows, to-wit : one arpent from the heirs of Mr. François Moreau, and the other arpent from Mr. J. B'te Vien, as it is witnessed by a deed of sale recorded in the office of the clerk of the county of St. Louis, book F, p. 385, together with all the rights, privileges and appurtenances which belong or may belong to the two arpens by forty above described and sold ; warranting them free from all gifts, debts, dower, mortgages, and all other encumbrances generally whatsoever : to have and possess the said eighty arpens to the said John Mullanphy, his heirs or assigns, in full and entire property, and as a thing by him lawfully acquired. Further, for and in virtue of the consideration aforesaid, we, the aforesaid Peter Chouteau and Brigette Saucie, his wife, sell, grant and transfer to the said Mr. John Mullanphy, all the rights, titles, claim, interest and estate which we have or may have to a certain piece of land

having one arpent by forty in depth, and touching to the north the piece of land above herein described and sold ; which last piece of land was originally granted to Mr. Louis Lirette, transferred by him to Mr. Vifarenne, and which we have acquired from the heirs of the said Vifarenne, — to have and possess the said forty arpens in surface to the said Mr. John Mullanphy, his heirs or assigns, as we might do ourselves in virtue of the deed of sale which has been delivered to us therefor ; warranting it, as towards and against ourselves, heirs, administrators or executors, to be free from all debts, dower, or mortgages, but without any other guaranty whatever."

8. In proof of a derivative title from Jean B'pte Vifvarenne, plaintiff, proved from the parish records, that on the 6th of August, 1777, the said Vifvarenne intermarried with Genevieve Cardinal ; that there were three children born of this marriage ; Jean B., baptized May 3d, 1779 ; Louis, baptized August 15th, 1780, and François, baptized April 9th, 1782. The parish records show the burial, on the 1st of January, 1781, of an infant of Vifvarenne, aged fourteen months, as stated in the certificate. This must have been the first-born. J. B. Vifvarenne, the elder, died leaving his wife, Genevieve, surviving. The precise time of his death did not appear. The evidence introduced by both parties fixes the date of his death in the early part of the year 1782. Of François, the youngest, no definite account was given. Plaintiff introduced several witnesses who knew Louis Vifvarenne in his boyhood, as also his father and mother. They agreed in saying that they never knew or heard of his having any brothers of the whole blood. One of plaintiff's witnesses, however, intimated that there was another child besides Louis, who died in infancy. Evidence introduced by the defendants, (an official inventory, taken August 19, 1782, purporting to be an inventory of the effects of the widow of Vifvarenne and her *two* children,) tended to prove that François survived his father. After the death of Vifvarenne, his widow (Genevieve) married Jacques Marechal, and had by him three sons—Charles, Toussaint, and Joseph. Gene-

vieve died in 1792, and was buried, as appears from the burial certificate, on the 2d of November, 1792.

Plaintiff read in evidence depositions of old French residents of St. Louis and of St. Charles, in this state, (to which latter place the widow of Vifvarenne removed after the death of her first husband, who were acquainted with Louis Vifvarenne. From these it appeared that Louis left St. Louis about the year 1800, and went to the lower country ; that he went to Opelousas, in Louisiana ; that he never returned to Missouri afterwards ; that there came a rumor of his death at that place. A large number of depositions, taken at Opelousas, were given in evidence, tending to prove that a person answering the description of Louis Vifvarenne, came to the parish of St. Landry, Louisiana, and took up his residence near Opelousas, in that parish ; that he was commonly known there by the name of Louis Cardinal ; that this Louis Cardinal was identical with Louis Vifvarenne, the son of J. B. Vifvarenne, of St. Louis ; that the said Louis died near Opelousas, in the year 1813. Louis Vifvarenne was never married. Defendants read in evidence certain depositions, tending to prove that the person called Louis Cardinal, spoken of by plaintiff's witnesses, who died at Opelousas in 1813, was a different person from Louis Vifvarenne, the son of J. B. Vifvarenne. There was also some slight evidence tending to prove that Louis Vifvarenne died before September 1st, 1807, when the territorial act regulating descents went into effect.

J. B. Vifvarenne had two sisters, who survived him : Catherine, wife of Joseph Labuxiere, and Felicité, wife of Antoine Sans Souci.

Plaintiff claims that upon the death of Louis Vifvarenne, in 1813, without issue, the land in controversy passed to the descendants of the said Catherine Labuxiere and the said Felicité Sans Souci, to the exclusion of the brothers of the said Louis of the half-blood.

9. Plaintiff gave in evidence sundry deeds from certain persons, the descendants and heirs of Catherine Labuxiere and .

Felicité Sans Souci. These conveyances gave, under the instructions of the court, as the plaintiff insisted, $\frac{313}{420}$ parts of whatever interest in the premises in dispute descended from Louis Vifvarenne to the representatives of his paternal aunts, Madame Labuxiere and Mad. Sans Souci.

10. The defendants, relying on the statute of limitations as a bar to plaintiff, introduced evidence under that issue, tending to prove that, in the year 1820, Mullanphy built a house on the east end of the Moreau arpent, and made a small enclosure of several arpens around it; that the south line of this enclosure ran into the Lirette arpent, and at the south-west corner of said enclosure, a small portion of the said arpent was enclosed; that in the year 1826 Waddingham removed the west fence so as to take in several additional arpens; that the south line of the enclosure did not follow the direction of the lines of the 40 arpent lots, but ran west at right angles to Broadway street; that the south fence remained in the same position until the year 1833, when it was removed further south; that in 1832, prior to this removal of the fence, Mullanphy declared to one Smith Robinson, who had applied for a lease of the ground south of the enclosure, that " he did not own any thing south of the enclosure."

The witnesses introduced by both parties were not agreed as to the extent of this enclosure on the south. Some of them thought that it extended across a considerable portion of the Lirette arpent. In 1839, the whole of the Lirette arpent was fenced in. The deed set forth above from P. Chouteau and wife to J. Mullanphy was recorded November 1st, 1819.

The defendants, to maintain the issues on their part, in addition to the evidence set forth above, introduced in evidence the following :

1. An extract from the connected plat of the St. Louis common fields from the office of the surveyor general, showing the position of lots as surveyed by the United States, from Cousat on the south, to Vien on the north, as follows :

Cutter v. Waddingham.

| | | |
|---|---|---|
| No. 1481. | Vien's Reps. ································· | 1 by 40 arps. |
| No. 1480. | Moreau's Reps. ························· | 1 by 40 arps. |
| No. 1479. | Lirette's Reps. ·························· | 1 by 40 arps. |
| No. 734. | Jno. Mullanphy under Jno. Bte. Provenchere·· | 2 by 40 arps. |
| No. 3301. | Amable Guion's leg. Rep. ················ | 1 by 40 arps. |
| No. 3003. | (of general series) School Land ·········· | 69.'85 acres. |
| No. 1478. | Auguste Conde's leg. Reps. ··············· | 1 by 40 arps. |
| No. 1438. | Pierre Chouteau under Cousat·············· | 2 by 40 arps. |

2. The marriage contract executed August 5th, 1777, between J. B. Vifvarenne and Genevieve Cardinal. This contract was in the French language, and was entered into before Francis Cruzat, lieutenant governor of the province. It stipulates for a conventual community by the following clauses :

—pour etre les dits futurs epoux uns et communs en tous biens meubles, et conquets immeubles, suivant et au desir de l'ancienne coutume etablie en cette colonie, a laquelle ils se soumettent pour raison du present contrat.

Les dits futurs epoux se prennent avec leurs biens et droits a eux appartenans actuellement, et ceux qui pourront leur avenire echoir et appartenir par la suite, tant par successsions, donations, legs, ou autrement, LESQUELS BIENS, de quelque cote qu'ils puissent leur venir, entreront pour le tout en communante sans aneune reserve.

—the said future spouses to be one and common in all moveable property, and immoveable *conquests*, according to the ancient custom established in this colony, to which they submit themselves by the force of the present contract.

The said future spouses take each other with the property and rights to them now belonging, and such as may happen to come and belong to them hereafter, whether by succession, gift, legacy or otherwise, which property from whatever side it may come to them, shall enter wholly into community without any reserve.

In another clause of the contract, the husband endows the wife with the sum of 600 livres *douaire prefix*, which were to be taken, as soon as dower attached, from the present or future property, moveable or immovable, of the husband ; and for such dower the said property was hypothecated with special privilege (*par privilege affectes et hypotheques.*)

The contract gives to the survivor the right to take, by *preciput*, 400 livres out of the community property. It also allows the wife to renounce the community and take back all she has brought in, together with her *douaire* and *preciput*, for the payment of which all the husband's property is hypothecated.

3. The official inventory of the effects of the widow Genevieve Vifvarenne and her two children, taken August 19th, 1782, under the direction of Cruzat, the lieut. governor, and signed by him; also the process verbal of the public sale of the same. In this inventory no mention is made of the forty arpent lot in controversy, or of any tract of land. Sans Souci, the brother-in-law of Vifvarenne, was a subscribing witness to the inventory.

4. A deed dated October 11, 1817, recorded December 11, 1819, from Toussaint, and Charles Marechal to Pierre Chouteau. This deed purported to be executed by the said Toussaint and Charles as "heirs at law of the late Jacques Marechal and of Madame Vifvarenne, his wife," and to convey to the said Chouteau "a certain piece of land lying and being situate near St. Louis, in the Little prairie, near the barn *lot* (La Grange de Terre), as well as all the rights, titles and claims which we have in and to the said piece of land as heirs of Madame Vifvarenne, and also those which we may have. The said piece of land now sold by us having one arpent in front by forty arpens deep, and bounded on the south by vacant lands, and on the north by lands of Moreau."

5. Defendants read in evidence the testimony of one Antoine Smith, given on the former trial, (in 1849) as follows: "That he knows where the Vifvarenne arpent or field lot is; it is bounded north by Moreau, and south by Provenchere; it is south of the Big Mound, on Broadway.

"Being cross-examined, said Smith stated that the said Vifvarenne field-lot he knows by having seen Lirette work upon it; when he (witness) came to this country, which was sixty years ago from the 25th of last August, said Lirette cultivated that common field lot, but left a year or two afterwards

and went to Florissant; that Lirette claimed said lot, and, as witness supposed, cultivated it for himself. This field lot is seven or eight arpens from the Big Mound, and is the sixth arpent north from Mrs. Biddle's; that no one else cultivated said Lirette arpent, to his knowledge; that he (witness) passed along there two or three weeks ago; the person who cultivated was Louis Lirette, who died some twenty-four or twenty-six years ago; he left children, but whether they are dead or alive he can not tell; that said Louis Vifvarenne worked on two arpens that came from his father, lying next north of Madame Biddle and next to Condé, on the north of and adjoining Condé; Louis cultivated there one year alone; that he came to St. Louis in the spring to raise a crop of corn; the two arpens aforesaid, on which he worked, were three arpens distant from and to the south of the said Lirette arpent; that the two arpens so worked by Louis came, as he said, from his father."

Defendants also introduced evidence showing that the lot confirmed to Lirette is situate between the two most conspicuous mounds east of the common fields; that it does not lie opposite the foot of either mound; that its eastern end is four arpens south of the northern mound, and five and a quarter arpens north of the southern mound; that the lot next north of Condé touches at its eastern end the conspicuous mound now known as the Reservoir mound.

6. A letter directed to the commissioner of the general land office, dated January 15, 1846, and signed by Martin Thomas, Norman Cutter (the plaintiff) and others. In this letter, title is claimed under Louis Vifvarenne to the tract of two by forty arpens next north of Condé, and it is based upon a confirmation by the act of June 13, 1812.

Defendants offered in evidence a letter of Martin Thomas to the board of president and directors of the St. Louis public schools, dated April 2d, 1839. In this letter, Thomas asserted title to the lot next north of Condé, under the act of sale of 1774 from Lirette to Vifvarenne. This act of sale was recorded in 1839, and then delivered by the recorder to Martin Thomas,

as appears from the recorder's certificate. This letter was
excluded on the objection of plaintiff, and defendants excepted.
The defendants also offered to prove that prior to the com-
mencement of this suit, the plaintiff, and others in privity with
him, entered into possession of the lot in the common fields,
situate north of Condé, claiming the same under the heirs of
J. B. Vifvarenne; that they asserted title thereto under the
deed from Lirette to Vifvarenne, dated in 1774, and read
in evidence on this trial; that they successfully maintained
their title to said land, and do at the present time hold one by
forty arpens of said land, or the avails thereof. The assertion
of title above spoken of, was against adversary claimants other
than the present defendants. The court, on the objection of
the plaintiff, excluded the said testimony, and to said exclusion
the said defendants then and there excepted.

7. The defendants then offered a deposition of Rene Paul,
purporting to have been taken before A. Wetmore and Du-
portal D. Davis, two justices of the peace, in August, 1844,
and filed on the 15th day of April, 1845, in a case wherein
Hempstead was plaintiff and Martin Thomas defendant [taken
and filed by Martin Thomas]. In this deposition Paul de-
clares that the true location of the lot described in the act of
sale of 1774, from Lirette to Vifvarenne, is next north of
Condé. This deposition was excluded on the objection of
plaintiff. Defendants excepted.

The court, on motion of the plaintiff, gave the following
instructions to the jury:

### Plaintiff's Instructions Given.

1. If the jury believe from the evidence that John Baptiste
Vifvarenne left more than one child surviving him, and that
either of said children died before his or her mother, and after
his father, and that Genevieve Cardinal was married a second
time to Jacques Mareschal, on or about the —— day of ——,
1784, such second marriage had the effect of depriving the said

Genevieve of any estate of inheritance derived from said child, and at the death of said Genevieve, if there was a surviving child of said John Baptiste Vifvarenne, said child took the entire estate. Such is the general rule, and if it is claimed by the defendants that John Baptiste Vifvarenne died before his wife attained the age of twenty-five years, and that therefore she should take from any deceased child or children of the first marriage, the jury are instructed that this is an exception to the general rule, and it is for the defendants to prove the facts upon which the exception is founded; and in the absence of any proof satisfactory to the jury, on this point, they will disregard the exception and find according to the general rule.

2. If the jury believe from the evidence that John Baptiste Vifvarenne was seized of the premises in question before his marriage with Genevieve Cardinal, and that he died before his said wife, then, upon his death, the estate descended to his heirs; and if the jury believe Louis Vifvarenne was his only surviving child, and that he died in 1813 or about that time, unmarried and not having had any legitimate children, then the premises went to his paternal kindred; and if the jury believe that the wife of Joseph Labuxiere, the elder, and the wife of Sans Souci were aunts of said Louis, and his nearest kindred on his father's side, they or their heirs took the estate in exclusion of any brothers of the half-blood, on the mother's side; and if the jury believe that Pierre Pollardie, Noel Pollardie, Antoine Pollardie, Michael Pollardie, Bazile Pollardie, Marie Pollardie, Celeste Tabeau, Elizabeth Denise Lamache, Marie Lamache and Jno. Baptiste Dorlack; and that Andre Beauchmin, Joseph Beauchmin, Mary Janis and Margrette Beauchmin; and that Joseph Labuxiere, jr., Eugene Labuxiere, Henry Labuxiere, Marcilete Letamps and her husband, Odile Letamps and her husband, and Marie Louise St. Amand and Louis Burtis were descendants and next of kin of Joseph Labuxiere, the elder, and his wife the sister of John B. Vifvarenne; and if the jury believe from the evidence that Felicité Marly, Victoire Marley, Luke Marley and John Baptiste Marley were descen-

dants and next of kin of Sans Souci and his wife, the sister of John B. Vifvarenne ; and that the deeds given in evidence from these persons were duly executed by them and the husbands of said Marcelite and Odile Letamps, and of Mary Janis, to the plaintiff in this suit, the jury will find for the plaintiff such portion of the premises of which defendants were in possession at the commencement of this suit, as the above persons would be entitled to as lineal descendants of said Labuxiere and said San Souci and their wives. If the jury believe that Charles Beauchmin has been absent from the state more than seven years, and no tidings have been had of him, his death will be presumed, and his share go to his brothers and sisters; and if they believe Louis Beauchmin dead intestate, and without children, his share went to his wife and brothers and sisters ; and if François Labuxiere is dead, his share went to his mother and brother and sisters.

3. The official survey of the United States, No. 1479, introduced on trial by plaintiff, is *prima facia* evidence of the true location of the one by forty arpens of land conceded to Louis Lirette on the 17th July, 1769, and confirmed by the act of congress of 9th April, 1816, to Lirette's representatives.

4. The certificate of burial from the parish of St. Landry, Opelousas, in Louisiana, is not to be received by the jury as evidence upon the question of legitimacy or illegitimacy of Louis Vifvarenne.

5. To enable the defendants to avail themselves of the statute of limitations, it must affirmatively appear to the jury by proof that their possession of the land in controversy, or the possession of those under whom they claim or of a part thereof, must have been held adversely to all others, by claiming the land under a deed purporting to convey the legal title, and that such possession and claim of the land must have commenced and continued without interruption or omission for twenty years before the commencement of this suit, claiming the same. If, therefore, the jury shall believe from the testimony that defendant, or those under whom they claim, had not such a posses-

sion of the land sued for, as commenced and continued, claiming the same as aforesaid, without interruption, for twenty years before the commencement of this suit, they will find for the plaintiff on the defence raised under the statute of limitations.

7. The jury are instructed that, if they believe from the evidence, that Joseph Labuxiere the elder, and his wife, the sister of John B. Vifvarenne, died before Louis Vifvarenne, then the deed of Joseph Beauchmin to François Labuxiere, dated August 2, 1830, and the deed of N. Janis, Andre Beauchmin and Marie Janis, to François Labuxiere, dated 2d August, 1830, and the deed of Louis Labuxiere to François Labuxiere, dated 28th July, 1830, and the deeds of François Labuxiere to John Steele, dated 3d August, 1830, and 9th September, 1830—all of which were introduced on this trial by defendants—conveyed no interest whatever in the land in controversy, and need not be noticed by the jury in their deliberations.

8. On the second marriage of Genevieve Cardinal with Jacques Mareschal, she became disabled from transmitting by descent to her heirs any property which she had acquired by gift, donation, legacy, *or in any other manner*, from John B. Vifvarenne, if he was her first husband, and if he died, leaving children surviving him, and any child or children of said John B. Vifvarenne survived said Genevieve Cardinal, provided said Genevieve was of age, i. e., twenty-five years old at the death of her first husband. To the giving of said instructions, and each of them, defendants then and there excepted.

### Defendants' Instructions Given.

On motion of the defendants, the court gave the following instructions to the jury :

1. Unless the jury are satisfied that the lot conceded to Lirette in 1769, and by him sold to J. B. Vifvarenne in 1774, is the same lot, part of which is sought to be recovered in the present suit, the plaintiff is not entitled to recover.

15—VOL. XXII.

2. The inventory read in evidence of Genevieve, is evidence tending to prove that at its date there were two sons of Bte. Vifvarenne and Genevieve then living.

3. If the jury find that J. B. Vifvarenne left two sons at his decease, the burthen of proof is on the plaintiff to show by evidence the fact of the death of said sons, and the time when such deaths occurred.

4. If the jury find from the evidence that the marginal notes to the copies from livre terrein No. 2, offered by plaintiff, were not part of the original record, but were placed there without competent authority, such marginal notes are not evidence of any thing.

### Defendants' Instructions Refused.

The defendants moved the court to give the following instructions to the jury :

5. If the jury find that Lirette was the person last in possession of the lot in question prior to the 20th December, 1803, and that he cultivated the same as his own, subsequently to the death of J. B. Vifvarenne, then the representatives of Vifvarenne are not entitled to the benefit of the confirmation, and the plaintiff can. not recover.

6. The testimony of Reviere and Dodier before the recorder in 1825, read by the plaintiff, is evidence that Lirette was the last person who cultivated the lot in question prior to 20th December, 1803.

7. Even if J. B. Vifvarenne was once owner of the lot in question, still if he parted with his title to the same before his death by sale, abandonment or forfeiture, then the plaintiff is not able to recover.

8. Under the Spanish law which prevailed here until the 24th day of March, 1804, land might be transferred without writing or abandoned by the owner, and a lot in the common fields might be forfeited by the owner by non-compliance with the public regulations.

9. If the paper purporting to be an inventory of the property ef Genevieve Vifvarenne and her two children is genuine and does not contain the lot in question, it is evidence that J. B. Vifvarenne was not the owner of the lot in question at the time of his death, if the jury find that the said J. B. Vifvarenne and Genevieve made the marriage contract read in evidence.

10. If J. B. Vifvarenne, being the owner of the lot in question, made the marriage contract read in evidence with Genevieve Cardinal, and subsequently intermarried with her, and died leaving her surviving; and the defendants are now in fact holding said lot by purchase under childen of said Genevieve, then the plaintiff can not recover in this action.

11. If J. B. Vifvarenne, while owner of the lot in question, and Genevieve Cardinal made the marriage contract read in evidence and subsequently intermarried, and J. B. Vifvarenne died insolvent, having no property to satisfy the rights and claims of said Genevieve under said contract except the lot in question, and the defendants are now holding said lot under sons of said Genevieve, then the plaintiffs are not entitled to recover.

12. If the jury find that the marriage contract between J. B. Vifvarenne and Genevieve, his wife, is genuine; that J. B. Vifvarenne died leaving two sons issue of that marriage, and that Genevieve died leaving *three* sons by a second husband, then, under the evidence of the plaintiff, Louis, one of the sons of said J. B. was entitled, at his death, to no more than seven-sixteenths of the lot in question.

13. If the jury belive that J. B. Vifvarenne and Genevieve Cardinal made the contract read in evidence, and intermarried, and afterward J. B. died leaving Genevieve surviving, then, by force of the contract, said Genevieve, on a settlement of the community, would be entitled to one half of the real property owned by said J. B. at the time of the marriage.

14. If the jury find that J. B. Vifvarenne and Genevieve Cardinal made the marriage contract read in evidence, and subsequently intermarried, then, on the dissolution of the marriage

by death of J. B., while said Genevieve was under the age of twenty-five, she would be entitled to take and hold the amount of 600 livres for dower out of the community property, and, in default of such community property, out of the separate property of said J. B. Vifvarenne.

15. Unless the jury believe that Louis Vifvarenne, the son of J. Bte. Vifvarenne, is identical with Louis Cardinal, mentioned in the depositions from Opelousas, there is no evidence that said Louis died after September 1, 1807.

16. If Louis Vifvarenne died before September 1, 1807, having brothers of the half-blood who have conveyed the lot in question, the plaintiff can not recover.

17. So much of the estate of Louis Vifvarenne, in the lot in question, as came to him prior to September 1, 1807, passed upon his death to brothers of the half-blood, in preference to uncles and aunts, if he died after September 1, 1807.

18. If Louis Vifvarenne, died after September 1, 1807, leaving brothers of the half-blood, such brothers would inherit, to the exclusion of the aunts of Louis Vifvarenne and their descendants.

19. So much of the estate of Louis Vifvarenne, in the lot in question, as came to him by descent from his mother or brother, passed by descent at his death, after September 1, 1807, to brothers of the half-blood, in preference to uncles or aunts, although such estate might have originally come to the mother or brother from his father.

20. The legal presumptions arising in the inventory introduced in evidence by defendants, if genuine, are, 1st, that the property mentioned in the inventory was, at the time it was made, the property of Jean Baptiste Vifvarenne, deceased; 2d, that the inventory contained all the property of the deceased; 3d, that these presumptions throw the burthen of proof on the party who denies their correctness; 4th, that, to prove that any property not mentioned in the inventory was, at the time it was made, the property of the deceased, it is not suffi-

cient to show that the deceased *once owned the property*—the proof must show that he owned it *at the time of his decease.*

21. The statement of the parentage of Louis Vifvarenne, *alias* Cardinal, in the burial certificate from Opelousas, is evidence of the parentage therein stated, if the jury believe the record of said burial to be genuine.

22. The recital in the deed of Chouteau and wife to Mullanphy, to the effect that the lot conveyed was conceded to Lirette, and by him transferred to Vifvarenne, are no evidence in the present action of the truth of the matters thus recited.

23. If the jury find that Charles and Toussaint Mareschal conveyed the lot in question to Chouteau in 1817, by their deed read in evidence ; and that said Chouteau, by his deed of 1819, read in evidence by the plaintiff, conveyed the same lot to John Mullanphy ; and that said Mullanphy, during his lifetime, and his heirs since his decease, have always claimed title to said land under said deed of Chouteau, and have exercised acts of ownership over the same by leasing or fencing the same, or parts thereof, from time to time, and that no claim was made to said premises by or under the heirs of J. B. or Louis Vifvarenne, until 1845,—then, in favor of such old title, the jury may presume an adjudication of said lot to Genevieve Vifvarenne, or a conveyance of the same lot to said Chouteau by the heirs of said Vifvarenne.

24. The said deed from Chouteau and wife to John Mullanphy, read in evidence by the plaintiff, is evidence for the defendants that the said John Mullanphy claimed a connected tract of land in the St. Louis common fields, having a front of three arpens and a depth of forty arpens : the northernmost arpent being the arpent originally granted to Vien, and the southernmost arpent being that originally granted to Lirette.

25. Possession of part of a tract of land by a party claiming the whole tract by a recorded deed, or by his tenant, is constructive possession of the whole tract, provided there be no adverse possession of such tract by any other person.

26. If the jury believe from the evidence that the ancestor

of the defendants, in his lifetime, and the defendants, since his death, by their respective tenants, have had uninterrupted possession of part of the above described premises or connected tract of land (the defendants and their ancestor claiming the same as their own, and having a recorded deed therefor), for the period of twenty years and upwards before the commencement of this suit, such possession is a bar to the maintenance of this action by the plaintiff as to any part of said tract of three by forty arpens; and the jury will find for the defendants, provided no one except said defendants and their tenants has had possession of any part of said tract of three by forty arpens within said period of twenty years.

27. It is not requisite that the jury, in order to find as indicated in the third instruction, should believe the part actually in possession of defendants to have been a portion of the arpent originally granted to Lirette, provided it were a part of the connected tract of three by forty arpens, conveyed by the said deed from Chouteau and wife to Mullanphy.

The court refused to give the last mentioned instructions, or any of them, and to such refusal the defendants then and there duly excepted. The court then, on defendants' motion, gave the following instructions to the jury:

28. If the jury believe from the evidence that John Mullanphy, in 1819, received from Pierre Chouteau the deed read in evidence by the plaintiff, and took possession in the following year of part of the land thereby conveyed, including part of the Lirette arpent within his enclosure, claiming the whole tract of three by forty arpens, by virtue of said deed, and by himself and his heirs continued so in possession for the space of twenty years before the commencement of this suit, there being no actual possession of the tract during that time except on the part of the said Mullanphy and his heirs, then such possession is a defence and a title to the said John Mullanphy and his heirs, as to the whole one by forty arpens confirmed to Lirette, against all persons not within the exception of the statute of

limitations; and it is the duty of the plaintiff to show himself within such exception.

29. The jury is further instructed that possession by the tenant of Mullanphy and his heirs, is equivalent in law, for the purposes of the foregoing instruction (No. 28), to the possession of said John Mullanphy or his heirs.

30. The baptismal certificate of Genevieve Cardinal is no evidence, in the present case, that she was of the age stated in such certificate at the time of her baptism.

The counsel, after the giving of the instructions to the jury, proceeded to address the jury; and after three days spent in argument, and when said argument was concluded, the court announced to the counsel that the instructions given by the court on the subject of the statute of limitations were, in the opinion of the court, repugnant and contradictory. Therefore the court withdrew from the jury the forementioned instructions given on defendants' motion, marked 28 and 29, and in lieu thereof gave to the jury the following instructions:

6. If John Mullanphy, in 1819, received from Pierre Chouteau the deed read in evidence by the plaintiff, and took possession in the following year of part of the land thereby conveyed, including part of the Lirette arpent within his enclosure, claiming the whole of three by forty arpens under the said deed, such possession of part of the Lirette tract, if continued uninterruptedly for the space of twenty years before suit, is a good defence under the statute of limitations, as to the whole tract, provided it shall be made to appear from the evidence that the claim to the portion unenclosed was open and notorious, and accompanied by such acts of ownership over the same as to indicate an intention to assert the ownership and possession of the whole, as by leasing or using the same in a manner usual and customary with reference to the description of the land.

9. Should the jury find for the defendants, the court requests, for its convenience, that they should state specially how they find as to the defence of the statute of limitations.

The court then informed the counsel for the defendants that,

if they desired it, they might then proceed to argue the case to the jury upon the instructions as they then stood, which they declined to do. To the withdrawal of said instructions, numbered 28 and 29, and to the giving of said instructions last given, the defendants then and there duly excepted.· The defendants then moved the court to give the following instruction to the jury :

31. If the jury shall believe from the evidence in the cause, that John Mullanphy, after purchasing by deed from Chouteau the Lirette arpent and the Moreau and Vien arpent, put up an enclosure with the intention of embracing the entire Lirette arpent on its south and east lines, but, from the uncertainty as to the actual location of said Lirette arpent, he ran his fence so as not to embrace the entire east and south lines of the said Lirette arpent ; yet, if they shall believe from the evidence that the fence, as run, embraced any part of the Lirette arpent, the possession of that part was possession of the whole, if there was at the time no adverse possession of the part not embraced by the enclosure.

The court refused to give said instruction, and to such refusal the defendants then and there duly excepted.

The jury retired from the bar on Friday morning, January 20, to consult upon their verdict. On the next day, the jury came back to the bar and were asked by the court if they had agreed upon a verdict. The foreman said: "We are not agreed, we want further instructions ; but I will state to the court that only some of the jury authorize me to make the request; the others do not wish it." The court then remarked to to them that, in that state of things, he was at a loss to perceive how he could render them any assistance. Nothing further falling from the jury, and after waiting upon them a suitable time, the court inquired of counsel on both sides, who were present in court, if they had any objection to its being ascertained how the jury stood numerically. No objection having been made on either side, and the court having cautioned the jury that he did not wish to know how they stood in reference

to the parties, but on'y how they were divided numerically, the foreman then answered : " There are eleven obstinate men among us." The court remarked that the extent of their division was different from what the observations of their foreman had led him to suppose, and added that the juror alluded to was at liberty to speak for himself, if he desired to do so. Thereupon said juror came forward and submitted to the court the following question, in writing, already prepared for the purpose before the jury came into court :

" If ten feet or more of any part of the Lirette arpent was enclosed by fence for the space of twenty years before this suit was brought, would that be considered possession under the statute of limitations for the whole tract in dispute ?" Defendants' counsel here moved that the jury be discharged, upon the ground that they had disclosed and rendered public their deliberations, and were therefore disqualified to act longer in the cause. The court refused to discharge the jury, and defendants' counsel at the time excepted. The court gave the following answer :

" That fact alone, unless accompanied by such acts of ownership over the unenclosed portion of the tract of the character already indicated in instructions given, would not suffice to constitute a defence under the statute of limitations." The jury found a verdict for the plaintiff. A motion for a new trial was duly made, overruled, and exceptions saved.

*R. M. Field, Hamilton R. Gamble, T. T. Gantt* and *J. R. Shepley*, for appellant. Mr. Field submitted a lengthy printed brief, of which the following is an abstract :

The grounds of defence may be grouped under five general heads.

*First.* The lot granted to Lirette and by him conveyed to Vifvarenne, was a different lot from that confirmed to Lirette's representative ; and was locally situate five and a quarter arpens farther south.

*Second.* If the lots were identically the same, still Lirette was the person last in possession prior to 1803, of the lot in

controversy, claiming the same as his own, and the lot was confirmed to *him* by the first section of the acts of 13th June, 1812.

*Third.* The immovable property of J. B. Vifvarenne was carried into conjugal community by a marriage contract had between him and his wife, and any rights that the heirs of the husband might have in the property could not be asserted in an action of ejectment against those claiming under the heirs of the wife.

*Fourth.* Whatever estate J. B. Vifvarenne had in the lot in controversy, passed by force of the marriage contract and the Spanish law of succession, or the territorial law of descent, to the half-blood brothers of Louis Vifvarenne, under whom the defendants claimed.

*Fifth.* The plaintiff and those under whom he claimed, had lost all title to the land, by the statute of limitations and by the lapse of time.

### *First—As to Location.*

1. The question of the true location of the lot granted to Lirette in 1769, was unquestionably proper to be passed upon by the jury as a mere question of fact. The first instruction given for the defendants fairly left the matter to the jury; and if the court had stopped there, the defendants would have no just cause of complaint on this point. But the whole force of this instruction was destroyed by the third instruction given for the plaintiff. Now, there was no dispute about the location of the lot confirmed in 1816; it was admitted on all hands to embrace the land in dispute. The whole controversy turned on the question whether this lot was the same as that granted in 1769. The instruction tells the jury, as matter of law, that the lots were one and the same; and of course this ground of defence was wholly cut off. The error was gross and palpable.

The only apology for this error exists in the circumstance that the deputy surveyor, in the description attached to survey

1479, goes out of his way to speak of the survey as being for the lot of ground to Lirette in 1769. But it is plain that the surveyor had no authority under the law to survey French grants as such. Those grants have been always held to be mere nullities. (Wright v. Thomas, 4 Mo. 577.) The statement, therefore, by the surveyor, that survey 1479 embraced the lot granted to Lirette in 1769, was an extra-official expression of his private opinion, which was entitled to no weight whatever in a court of justice.

The court below erred in its action upon the evidence bearing on this question of location. The plaintiff was permitted to read the deed of Chouteau to Mullanphy containing recitals to the effect that the land conveyed was conceded to Lirette and by him transferred to Vifvarenne. The object of the plaintiff clearly was to prove the location by the declaration of defendants' grantor. On the other hand, defendants were not permitted to prove that plaintiff had himself asserted and maintained title to a tract of one by forty arpens under the same title papers located elsewhere, to-wit, next north of Condé. See also defendants' instruction refused, No. 22. The decisions of the court are irreconcilable ; both may be wrong—one certainly is.

*Second—As to the Confirmation by Act of 1812.*

1. The construction of the act of the 13th of June, 1812, has been settled by a series of decisions in this court, commencing with the case of Lajoye v. Prim, 3 Mo. 368, and coming down to Soulard v. Clark, 19 Mo. 570. The doctrine of these cases has been recently affirmed by the Supreme Court of the United States. (Guitard v. Stoddard, 16 How. 494.) The rule, as established by the cases, may be thus stated. The confirmation by the act of 1812 is not founded on any grants or title papers, but simply on the right, title or claim evidenced by the fact of inhabitation, cultivation or possession prior to 1803. Where there has been in succession a possession of the

same lot by diffcrent persons, as was the case in Lajoye v. Prim, the person last in possession prior to 1803 is entitled to the benefit of the confirmation. It is not doubted that title papers may be produced for the purpose of showing who has succeeded to the right, title or claim attaching to the fact of possession; but this limitation of the rule has no application to the case before the court.

The testimony of Antoine Smith, the plaintiff's witness, was direct and explicit that Lirette was in possession of the lot in controversy, cultivating it as his own, sixteen years after the date of the conveyance to Vifvarenne, and full eight years after the death of Vifvarenne. There was not the slightest evidence to the contrary of this. Under this state of the case, the defendants moved instruction 5th, which was refused by the court. 2. Instructions 7 and 8, as to abandonment and parol transfer of land under the Spanish law, were improperly refused. They were pertinent to the case. (Strother v. Lucas, 12 Pet. 3.) Instructions Nos. 9 and 20 ought to have been given. They gave to the inventory no other effect than what it had by the Spanish law, when it was made: "The inventory is an instrument in which is set down the property met with upon a person's death, bankruptcy or other occasion, and was introduced as of common right for four reasons: 1. That the heirs might not conceal the hereditary property, especially the moveables. 2. That they might not be bound beyond the actual amount of the inheritance. 3. That as by means of it there could be no doubt about the amount of the inheritance, they could not ask delay to accept or renounce it. 4. *To make proof of any negative allegations which are judged incapable of proof in any other manner.*" (4 Febrero, 1.) Defendants alleged that the property in dispute was not the property of Vifvarenne, and the inventory was adduced as proof of this negative allegation. (See also 4 Febrero, 14, 105; Escriche, Dicc. de Legisl. y Jurisp. voc. Inventario.) Under the Spanish law the inventory taken by public authority was never treated as a mere *ex parte* proceeding, but partook of the character of a solemn

judicial inquisition. The separate property of the spouses was always included in the inventory taken of the community property under the Spanish law. (See 5 Febrero ; Ferriere cout. de Paris, vol. 3, p. 586.) 4. Defendants' instruction 6 should have been given.

### Third—The Marriage Contract.

The marriage contract creates a community between the parties " according to the ancient custom established in this colony." The custom here referred to can be no other than the Custom of Paris. That custom was the common law of the French colonies. (Petit, Gouvernment des Colonies, tome 2, p. 17J, 146, 171, 177 ; 1 id. 71 ; Charter to Crozat, art. 7 ; 1 Bioren & Duane's Stat. U. S. 439.) This custom unquestionably subsisted here until the Spanish government took possession of the colony in 1769. It was never formally abrogated by the Spanish authority, so far as it concerned the private contracts of the inhabitants. O'Reilly's proclamation in 1769 did not have that effect. For Mr. Jefferson's opinion, to the effect that this proclamation only introduced the Spanish law in respect to judicial procedure, see 2 Duff Green's State Papers, public lands, p. 1. The Supreme Court of Louisiana has decided that the Spanish law was introduced into Lower Louisiana not by force of O'Reilly's proclamation, but by usage or popular adoption. (Beard v. Poydras, 4 Mart. 367.) No such adoption of the Spanish law of contracts was ever had by the people of Upper Louisiana. Their contracts were almost invariably in the French language, and, it is believed, always after the French forms.

The rights of the parties, then, under their marriage contract, are to be determined by the custom of Paris. By the custom of Paris, all the movables entered into and became a part of the common property, as also all immovable property acquired by either spouse during the marriage otherwise than by succession, or by donation or testament, from an ancestor in the direct

ascending line. The immovable property, owned by either spouse at the time of the marriage, did not enter into the community, but remained the separate property (*propre*) of the party to which it belonged. Such was the general rule. Nevertheless, the parties were at liberty, by their marriage contract, to vary the above rule according to their pleasure. They might withhold any or all of their movables from the community, and this was called *realisation ;* or they might carry any or all of their immovables into the community, and this was called *ameublissement.* (See LeBrun Trait. Com. 61 ; Ferriere, Cout. de Paris, III, 60, 63 ; Pothier, Trait. de la Com. P. 1, c. 3, *a* 3 ; 7 Toullier, 252 ; Duplessis, Traite de la Com. p. 359, 363, 428 ; Merlin Repertoire voc. Ameublissement ; 2 Beaubien, Lois du Bas Canada, 302 ; 1 Low. Can. Rep. 25.)

The lot in question in this cause was carried into the conjugal community by the marriage contract. It is contended for the respondent that the clause of *ameublissement*, in the marriage contract, merely *ameubles* such *propres* as might come to the parties after marriage. This position is not tenable. The insertion of the clause, " *and such as may happen to come and belong to them hereafter, whether by succession, gift, legacy, or otherwise,*" does not so narrow down the effect of the whole clause. A little further examination of the French writers will show the reason of the particular form adopted in the clause under consideration. It was a question among French jurisconsults whether a general *ameublissement* of *all property* was effectual to take into community after acquired *propres.* Le Brun decides this question in the affirmative. (Traite de Com. p. 61.) Ferriere inclines to an opposite opinion. (Ferrriere, 3, Coutume de Paris, 63.) Pothier leans to the opinion of Ferriere. (Pothier, Traite de Com. P. 1, *a* 3, *u* 3.) Toullier, an able writer of the present century, determines this question in favor of the opinion of Le Brun. Although he thinks a conventional community of all property will take in future *propres*, yet with the caution of a prudent·

lawyer he says, " *il est bon de l'exprimer dans le contract.*"
(7 Toullier, 257.)

With the aid of the extracts that we have given above, there
is not the least difficulty in ascertaining the force and meaning
of the clause of *ameublissemt nt* in the contract in question.
It was the intention of the parties that all their property, pre-
sent and future, should enter into community ; but as there was
a doubt suggested by jurists whether the future property should
not be particularly named, they were careful to avoid the doubt
by naming it expressly in the contract.   It certainly would be
a curious result in jurisprudence that the words obviously used
by the parties to make sure of bringing *all* into community,
should be perverted to the purpose of excluding *all* from it.

As the property of the husband, by force of the contract,
passed to the community, it remains to be ascertained to whom
it passed on the death of the husband.   On this subject the
custom of Paris is too explicit to admit of any controversy.
The 229th article is in these words :

| | |
|---|---|
| Apres le trepas de l'un des dits con-joints, les biens de la dite communaute se divisent en telle maniere que la moitie en appartient au survivant et l'autre moiete aux heritiers du tre-passe. | After the death of one of the said parties, the property of the said com-munity is divided in such manner that the half of it belongs to the survivor and the other half to the heirs of the deceased. |

Property brought into the community by either husband or
wife, is not taken back by such party at the dissolution of the
community.   (See Le Brun, 538 ; Pothier, p. 1, c. 3, *a* 3 ;
1 Demoulin, 871 ; Duplessis, Cout. de Paris, 428 ; Ferriere,
Cout. de Paris, 270 ; 7 Toullier, 128.)

It will be proper to consider how the community between
Vifvarenne and wife was to be settled according to the terms of
their contract.   From the mass of the community property,
which, by force of the clause of *ameublissement* was all to be
regarded as movable, the wife, being the survivor, was entitled
to take 400 livres as *preciput;* she was then entitled to take
600 livres from her husband's share for *douaire,* which would

be equivalent to 1200 livres from the community property. The wife then, in the first instance, was to take 1600 livres from the community property, and the residue of the mass of property was to be divided by moieties between her and the children. The right of the children did not attach to the moiety of any particular piece of property, but to the half of the whole *as one mass*, after the rights of the wife were satisfied. Under such circumstances, it was insisted that the action of ejectment would not lie in favor of the representative of the children against the representative of the wife ; and defendants' instruction No. 10 was asked and refused.

The inconvenience, or rather the utter impracticability of settling a community in an action of ejectment, strikes the mind at once ; and the gross injustice to which it may lead, will appear by attending to another circumstance in this case. The defendants offered to show that the plaintiff had in fact obtained under Vifvarenne two by forty arpens of land belonging to the community. Now, nothing can be plainer than that in any fair adjustment of the community between the representatives of the husband and of the wife, they should respectively account for what they had received. But the court below rejected the evidence on the ground, as it would seem, that in an action at law for one piece of property, it was not competent to inquire into the title to other property. It would scarcely be possible to state a more forcible argument against the propriety of allowing parties to an unsettled community to litigate their rights in an action of ejectment, than what is implied in this decision of the court.

Defendants' instruction No. 11 should have been given.

### Fourth—Succession.

Waiving now all question about the title to the property in J. B. Vifvarenne, and all objections to the particular form of action actually resorted to by the plaintiff, it is to be considered what were the rights of the parties under the marriage contract

and the law of succession and descent. The plaintiff contends that whatever right of property the wife had in the husband's immovables, by force of the marriage contract, was lost on her

*Second Marriage.*

The Spanish law on this subject is mainly borrowed from the civil law. By the provisions of the civil law, husband or wife resorting to second nuptials, was required to reserve for the children of the first marriage all property acquired from the former spouse by mere *lucrative* title, or, as it is expressed by Domat, " every thing that is given by the law or by the marriage contract, *in favor of one party*, out of the property of the other." The rule, however, did not extend to patrimonial property, or to such as the party had acquired by his own industry, or by any other *onerous* title. The subject is fully explained in 2 Domat, secs. 3431–3439. The Spanish law was to the same effect. Febrero says :

La muger que contrae segundas nupcias esta obligada a reservar a los hijos de su primer matrimonio la propriedad de todos los bienes que hubo de su marido por arras, testamento, fideicomiso, legado, donacion entre vivos o por causa de muerte, y por otro qualquier *titulo lucrativo.*

The wife who contracts second nuptials is obliged to reserve to the children of her first marriage the property in all the effects which she had from her husband in the way of *arras*, testament, trust, legacy, gift *inter vivos* or *causa mortis*, or by any other *lucrative title.*

&ast; &ast; &ast;

Pero de los bienes que multiplican y adquieren con su industria constante matrimonio, nada tienen obligacion de reservarles, aunque se casen muchas veces y del tal matrimonio en que adquirieron los bienes hayan hijos, antes bien pueden disponer de ellos como de los patrimoniales, por que los adquieren con su industria y trabajo, que es *titulo oneroso.* (7 Feb. 242.)

But in respect to the property which is produced and acquired by industry during the marriage, they are under no obligation to reserve it, though they marry many times, and though of the marriage in which it is acquired, children are born ; on the contrary, they may dispose of it as patrimonial, because they acquired it by industry and labor, which is an *onerous title.*

For definitions of the terms *onerous* and *lucrative*, as applied to titles, see Escriche, Dicc. voc. Bienes reservables. Ganancial property was not at all affected by the law of second

nuptials. (5 Feb. 276; 14th Law of Toro. Nov. Recop. lib. 10, tit. 4.) There appears to be little difficulty in determining the true character of the title of the wife to one half of the immovables of the husband, brought into the community by the contract. The husband, by the clause of *ameublissement*, made no gift to the wife. The same clause carried into community the property of the wife. The title of the wife, therefore, under the clause of *ameublissement*, was bought and paid for by an equivalent expressed in the contract. If this was not an *onerous* title on the part of the wife, there is difficulty in ascertaining the true distinction between *onerous* and *lucrative* titles.

Plaintiff's instruction No. 8 should not have been given. The use of the phrase, " *or in any other manner*," effectually cut off all possible claim of defendants through Genevieve Cardinal. In any supposable case, the law of the court below was, that Genevieve Cardinal could take no transmissible interest from J. B. Vifvarenne, if he were her first husband. Defendants' instruction No. 14 should have been given.

On the hypothesis that J. B. Vifvarenne, at the time of his death, was the owner of the lot in controversy, and that the title in whole or in part passed to his son Louis, it remains to be considered to whom the title passed on the death of the latter. The rights of the parties may depend on the time when Louis, the son, died. There was evidence tending to show that he died before 1804; there was other evidence tending to show that he died in 1813. Up to September 1, 1807, the Spanish law of succession prevailed; at that date a new law was introduced. If Louis Vifvarenne died before September 1, 1807, the rights of the parties may, to some extent, come to be determined according to the

*Spanish Law of Succession.*

The plaintiff claimed the property in controversy under the descendants of the paternal aunts of Louis Vifvarenne. The defendants exhibited a deed from the half-brothers of Louis

Vifvarenne, on the mother's side. The question now is, which is to be preferred, according to the Spanish law of succession—brothers of the half-blood, or aunts and their descendants?

The Spanish law, in this particular, does not materially differ from the civil law, as contained in the 118th novell of Justinian. This celebrated novell, which has been adopted into the jurisprudence of the greater part of the civilized world, made no distinction among the collaterals of the whole blood and of the half-blood, except in respect to brothers and their descendants. No regard was had to the side or line by which the property came to the decedent, but the whole succession passed by one uniform rule. The first order of succession among collaterals consisted of brothers of the whole blood and their descendants, who wholly excluded brothers of the half-blood. The second order was brothers of the half-blood, who excluded uncles and aunts, and all remoter collaterals. If, therefore, the decedent left half-brothers by either side, and aunts or their descendants, by the civil law, there being no nearer heirs, the half-brothers would take all, and the aunts or their descendants nothing. (2 Domat's Civil Law, sec. 2928 *et seq.*)

The Spanish law was the same. In one particular, however, it differed perhaps from the civil law. When the decedent left no brothers of the whole blood, but brothers of the half-blood on each side, then, by the Spanish law, regard was had to the side by which the property came to the decedent; in suchwise that property, coming from the father, passed to the half-brothers on the father's side, and that coming from the mother, to the half-brothers on the mother's side. This was the only instance in which any attention was paid to the line by which property came to the decedent; and the rule was never extended beyond brothers and their descendants. In all cases, brothers of the half-blood would exclude uncles and aunts, by whichsoever side or line the property came to the decedent.

[Counsel here gave lengthy translations from Escriche's Dictionary of Jurisprudence, and from Febrero, sustaining the rules of the Spanish law of succession as laid down.—REP.]

See also Schmidt's Civil Laws of Spain, 265; 1 White's Recop. 116. Defendants' instruction No. 16 was, therefore, improperly refused. It should have been left to the jury to determine the date of the death of Louis Vifvarenne. As the court ruled it, the true date of his death became of no importance whatever.

### Territorial Law of Descent.

This act went into effect September 1st, 1807. (See 1 Ter. Laws, 125.) It superseded the Spanish law of succession.

I. The statute has no application to property acquired by the intestate, before the passage of the act, for the plain reason that no such title as that mentioned in the above section was known to the law before the statute was enacted. It is not pretended that Louis Vifvarenne, the intestate, ever acquired any interest in the property in dispute, by devise or gift; or even by descent, strictly speaking. It is, however, insisted by the plaintiff's counsel, that he acquired it by a title equivalent or at least analogous to *descent*; that is, by *succession*, under the Spanish law.

The Spanish law of succession differed widely from the English common law of descent. The last mentioned law, adopting a classification of things peculiar to itself, transmitted to the ordinary the title of the decedent to all his *personal* property, and cast upon the heir, by mere operation of law, the title to all his *real* property. In the Spanish law, the common law classification of things was not at all regarded. There was, indeed, for some purposes a distinction made between property *movable* and *immovable*; but it was essentially different from the common law division of property into *personal* and *real*. For instance, a term, whether of long or short duration, was by the English law a chattel; by the Spanish law, it was an immovable. So the stock of a farm, whether cattle, implements of husbandry or the like, was *personal* by the common law, and *immovable* by the Spanish law.

(Escriche, Dicc. voc. Bienes inmeubles.) But in the matter of *succession*, the Spanish law paid no attention to this classification of property, whether natural or arbitrary. The whole property of the decedent, *real* or *personal, immovable* or *movable*, was *welded into one mass*, and passed to the heirs by one common title. When partition came to be made among the heirs, the same rule was observed. It was a distribution of values, not a partition in kind. (Escriche, Dicc. voc. Sucesion, Herencia, Particion de Herencia.) For the sake of illustration, let it be supposed that the elder Vifvarenne, at the time of his decease in 1781, left for succession to his two children the lot of land now in controversy, worth then one hundred livres (say twenty dollars), and also a bag containing one hundred livres in coin. On a partition had according to the Spanish law, between the two sons, Louis takes the lot of land and François the bag of coin. Unquestionably, in 1781, they took their several parts by one and the same title. Did the legislature of Missouri, in 1807, seriously propose to itself to change the character of these titles, and make one a title by the English law of descent, and the other a title under the English statute of distribution? But this is not all. It has been shown that all the property of the elder Vifvarenne was carried into community by the marriage contract. Upon the dissolution of the community, partition of the property would be made between the survivor and the heirs of the first deceased, as in cases of succession; that is, the whole property, without distinction of nature, quality or legal character, would be comprised in *one mass*, and each party would take out the *share in value* to which he was entitled. (See the form of partition of community property under the Spanish law, 5 Febr. 429 *et seq.*) Suppose, then, that the elder Vifvarenne left at his decease, as property of the community, the lot now in controversy, worth 100 livres (made a movable by the marriage contract), a bag of coin of 100 livres, and another lot belonging to the wife (made movable by the contract), worth 200 livres: on a partition of the property, the wife takes out the

husband's lot and the bag of coin, and Louis and François take the lot brought in by the wife, being the equivalent of what their mother has received : is the title of the children different from that of the mother ?  Do they claim by *descent* from their father ?  Or, after all, does the title under the statute of 1807 depend wholly upon the accident of the Spanish partition forty years before ?  It is manifest•that an attempt to apply the statute of 1807 to property acquired under a wholly different state of the law, runs at once to absurdity.  The conclusion is, that the legislative power, in 1807, never contemplated an inquiry into the origin of a title prior to the date of the statute under consideration, but intended to lay down a rule for the future, to apply only to descents, devisees or gifts that might afterwards happen.  In fact, upon any other hypothesis, the act is retrospective, giving to a title to property a new and different quality.  This court did not hesitate to declare that an act of the legislature changing the quality of an artificial person, such as an administrator, was unconstitutional and void.  (Frye v. Kimball, 16 Mo. 9.)

II. Under the statute of 1807, brothers of the half-blood were entitled to the inheritance, in preference to uncles or aunts, or their descendants on the side by which the property came to the intestate.  It becomes necessary here to state the provisions of the law under consideration somewhat more particularly.  The 6th and 7th sections are applicable only to widows and descendants, and may be left out of view.  The 8th section gives to the father, in case the decedent left no widow nor descendants, a life estate in the property of the intestate, unless it came from the part of the mother ; in which case, " *it shall descend as if the intestate had survived the father.*"  The 9th section gives to the brothers and sisters, and their descendants, the inheritance, to be distributed among them as tenants in common after the death of the father.  The 10th and 17th sections contain the like provisions in respect to the mother, declaring that, " if the estate came from the part of the father, it shall pass *as if the intestate had survived*

*the mother.*" The last clause of the 11th section, the 12th section, and part of the 14th section of the act are as follows : "And in the same manner the estate of any intestate, leaving neither widow nor lawful issue, nor father and mother, but brothers and sisters, shall be *distributed* among the brothers and sisters of such intestate, or their representatives."

"Sec. 12. There shall be no distinction in the *distribution* of any intestate's estate between kindred of the whole or half-blood, unless when the inheritance came to the said person so seized by descent, devise or gift, of some one of his or her ancestors ; in which case, all those who are not of the blood of such ancestors shall be excluded from such inheritance.

"Sec. 14. The real and personal estate and slaves of any person dying intestate, in case such person leaves neither widow nor lineal descendants, nor father or mother, nor brother or sister, nor lawful issue of any brother or sister, shall descend to and be divided amongst the next of kin of equal degree," &c.

The question now is, whether it was the intention of the legislative authority, by the 12th section, as quoted above, to exclude those of the half-blood, absolutely, *out and out*, so as to admit those standing in a more distant degree, or simply to exclude them when claiming against those who stood in equal degree.

The defendants insist that brothers of the half-blood are entitled to the inheritance as against more remote relations.

1. The last clause of the 11th section directs *distribution* among brothers and sisters and their representatives. The 12th section declares the rule of *distribution* among those of the whole and half-blood. Now, there can be no case of *distribution* unless the parties stand in the same degree. Brothers of the whole blood might exclude brothers of the half-blood in a question of distribution ; but there never could arise any question of *distribution* between brothers and remoter kindred. It would become simply a question of preference, priority, exclusion. Accordingly, half-blood brothers would take nothing when there were brothers of the whole blood claiming the inheritance ; for this would be the actual case of *distribution* men-

tioned in the statute. But in a case where no brothers of the whole blood exist, no *distribution* in respect to half·blood brothers and remoter kindred is to be had ; but the rights of the parties depend simply on their proximity to the intestate ; and the half-brothers were plainly entitled to the estate under the letter of the 11th section.

2. There can not possibly be any of the half-blood beyond brothers or sisters·and their descendants, as that term *half-blood* is understood in the law. Consequently, the 12th section of the statute under consideration has no application to any case except that in which a controversy arises among brothers or sisters and their·descendants. It certainly has no application to the present case, as the dispute between the half-brothers and paternal aunts of Louis Vifvarenne does not at all turn on the *quantum* of the intestate's blood that they might have in their veins, but, as the plaintiff insists, on their relation by blood to the father of the intestate. In short, the 12th section of the statute is extended far beyond its terms by the counsel of the plaintiff, and is made to embrace all cases of the *whole blood* to the intestate when there happens not to be blood relationship to the first purchaser.

3. The statute itself has furnished a sure *guide to its just* interpretation. When the intention existed to exclude, *out and out*, the father and mother from the inheritance, this intention was expressed in plain and unequivocal language. Accordingly, in the 8th and 17th sections, it is enacted that, *where the estate came from one parent, it should descend as if the intestate had survived the other parent.* Now, if there was the same intention to exclude the brothers of the half-blood absolutely by the 12th section, how happens it that the plain terms of the 8th and 17th sections were not adopted ?

4. By the 14th section of the statute under consideration, the paternal aunts of the intestate, as next of kin, were entitled to inherit only in the event that the intestate " *leaves no brother*." But Louis Vifvarenne, the intestate, did leave two brothers. How, then, can the plaintiff make out a title under the

aunts? He proposes to do it by interpolating, in the statute, after the word "*brother*," the words "*of the blood of the first purchaser*." The court, then, is called upon to make a new law to suit the plaintiff's case. In this aspect of the case, the inquiry would be, not what the law was, but what it ought to have been. This question should have been discussed fifty years ago.

5. But the 12th section must be construed in reference to the antecedent law. Now, it has already appeared that, under the Spanish law, the brothers of the whole blood would entirely exclude brothers of the half-blood from an inheritance, however acquired. The section of the law under consideration professes to limit this rule to the case where the inheritance was acquired by the side to which the brother of the half-blood was not related. Under the plaintiff's construction, however, this section was not a limitation upon a pre-existing distinction between the whole and half-blood, but was itself an independent rule of absolute exclusion, and is to be applied even to the case of the whole blood, as will presently appear. Defendants' instruction on this point, No. 18, should have been given.

III. Conceding now, for the sake of the argument, that the half-blood brothers, under whom the defendants claim, were absolutely excluded by the terms of the 12th section, it remains to be considered who, then, was the *next of kin* under the 14th section of act? The plaintiff proved that the Pawnee grandmother of Louis Vifvarenne was living about 1817. This was four years after the death of Louis Cardinal at Opelousas.

Under the civil and Spanish laws, the grandmother, as sole surviving ascendant, there being no descendants, would have been entitled to the whole inheritance. Under the English statute of distributions, it has uniformly been held that the grandmother, as *next of kin*, would entirely exclude uncles and aunts who stand in one degree more remote. (2 Williams on Executors, 928.) The result is, that the grandmother took the whole estate, and the plaintiff is left without any title whatever.

There certainly is not a line or a word in the act that impairs the right of the grandmother, as next of kin, after the brothers of the deceased.

In vain will the plaintiff invoke the provisions of the 12th section; for that section has performed its office, by making the proper *distinction* between the whole and the half-blood, and by removing the half-blood out of the way of the next of kin. Finally, the plaintiff's counsel are driven to insist that a construction of the statute excluding the half-brothers and letting in their grandmother, is absurd. This must be admitted. The consequence is that the plaintiff's construction, excluding from the inheritance brothers of the half-blood, in favor of remoter kindred, is disproved by a logical *reductio ad absurdum*.

Defendants' instruction No. 19 should have been given. The proposition advanced in this instruction rests upon an interpretation of the 12th section of the law of 1807, making the *descent* there spoken of the *immediate descent* to the intestate. It is believed that such is the just interpretation of the section. (See Gardner v. Collins, 2 Peters, 51; Den v. Jones, 3 Hals. 340; Curren v. Taylor, 19 Ohio, 36.) There was no question made between the parties that at least one quarter part of the property in dispute was derived by succession from François, either immediately or through the common mother.

Mr. *T. T. Gantt* argued in a written brief and also orally the following points: 1. Instruction No. 5 for plaintiff is erroneous. It is not true that the claim accompanying a possession and making it adverse must be shown by a deed. A deed shows the extent of a person's claim perhaps more accurately than it could otherwise be evidenced; but to tell the jury that it can be shown only by a deed, is to mislead them. So also it is erroneous to rule that this claim must appear by " a deed purporting to convey the legal title." Which of the jury is competent to decide when the deed purports to convey the legal

title. The phrase "without interruption *or omission*" tended
to mislead the jury.   2. Defendants' instructions Nos. 24, 25,
26 and 27, were improperly refused.   They contain a correct
exposition of the law.   3. The two instructions numbered 28
and 29, are also correct expositions of the law.   They do not
state the doctrine on the subject of possession as strongly as
the defendants were entitled to demand that it should be.   There
was gross error and impropriety on the part of the court below,
in withdrawing these instructions from the jury after the argu-
ment of the cause, and giving in lieu thereof instruction marked
6.   This last mentioned instruction is contradictory to itself,
to authority and to reason.   The intimation accompanying it,
(marked instruction No. 9,) is such an interference with the
province of the jury, that for this alone the judgment of the
court below should be reversed.   In aid of these propositions
the following authorities are cited : Boyce v. Blake, 2 Dana,
127 ; Oates v. Loftus' heirs, 4 Monr. 442 ; Ellicott v. Pearl,
10 Pet. 412, 442 ; Lee v. McDaniel, 1 Marsh. 234 ; Hopkins
v. Robinson, 3 Watts, 205 ; Smith's heirs v. Frost's devisee,
2 Dana, 148 ; 4 Bibb, 559 ; Fox v. Hunter, 4 Bibb, 563 ; Si-
caid v. Davis, 6 Pet. 124, 139.   The case of Saxton v. Hunt,
1 Spencer, 487, will be found, on examination, to go no fur-
ther than the cases in 2 Dana, 349, and 4 Bibb, 559.   The
case in 1 Spencer merely decided that an *actual* possession
can be admitted only by an adverse *actual* entry, not by a
*constructive* entry.   No lawyer denies this.   The case of Far-
rar v. Eastman, 10 Maine, (1 Fairf.) 191, 165, is really an
authority to the same effect as those cited from Kentucky.   It
is plain that, had the two tracts *adjoined*, the opinion of the
court would have been different.   The decision turns on the
fact of the two tracts not touching each other.   (See also 2
Maine, 275 ; 1 McLean, 214, 265 ; 3 id. 457.)   That the
statute of limitations did commence running before the survey
in 1826, see Landes v. Perkins, 12 Mo. 138.

*Geyer, Lord* and *Williams*, for respondent.   Mr. Lord, in
a printed brief, made the following points : 1. Waddingham,

one of the defendants, was properly admitted to testify as to his possession of the property in controversy. 2. The testimony offered by defendants to the effect " that, prior to the commencement of this suit, the plaintiff, and others in privity with him, entered into the possession of the lot in the common fields, situate north of Condé," &c., was properly excluded. Both parties claim the *same* lot, and both claim it under Vifvarenne. 3. The court properly excluded the paper purporting to be the deposition of Rene Paul, taken before two justices of the peace, in a case wherein Hempstead was plaintiff, and Thomas, defendant. There was no privity between the parties to that suit and the plaintiff. The testimony purported to be taken in August, 1844, and was not filed until April, 1845. It could not have been read, if objected to, in the cause in which it purported to be taken. 4. The letter of Martin Thomas, dated April 2d, 1839, to the school commissioners, was wholly irrelevant. 5. The instructions given on the statute of limitations put the case fairly before the jury, and were as favorable towards the defendants as the case would bear. (See 1 Cow. 286 ; 1 Root, 412 ; 6 Cow. 623, 725 ; Adams on Eject. 484 ; 12 N. H. 9 ; 1 Dev. & Bat. 546 ; 1 Fairfield, 191 ; 6 Har. & J. 836 ; 1 Wash. C. C. 70, 80 ; 6 Ham. 87 ; 9 Johns. 306 ; 10 Wend. 411 ; 2 A. K. Marsh. 454.) 6. There is no proof in this case that Lirette was the last person in possession of the lot in controversy prior to December 20, 1803 ; even if Lirette had occupied the said lot after his conveyance to Vifvarenne, his occupation would have enured to the benefit of the latter. Defendants' instructions Nos. 5 and 6 were, therefore, properly refused ; so also those marked 7 and 8. 7. Defendants' instructions 9 and 20, upon the effect to be given to the inventory given in the evidence by defendants, were properly refused. 8. The land in controversy being the separate property of J. B. Vifavarenne, did not, on the marriage of the said Vifvarenne, enter into a community established between him and his wife, Genevieve. It remained his separate property, and at his death passed to his heirs. (Childress v. Cut-

Cutter v. Waddingham.

ter, 16 Mo. 24 ; 1 White Recop. 51, 63 ; 10 Mo. 318 ; 9 Mart. 217 ; Schmidt's Civil Law of Spain and Mexico, 13 ; 4 La. Ann. 250 ; 4 Mart. N. S. 212, 221 ; 2 La. Ann. 226 ; 5 Mart. N. S. 98 ; 19 Louis. 329 ; 17 Louis. 251 ; 3 La. Ann. 611 ; 5 Rob. 299 ; 6 Pothier, 59, 97, 122, 199, 208–9.) The marriage contract did not make it community property. 9. Upon the death of François and the mother, Genevieve, the land in question vested absolutely in Louis Vifvarenne, and he having died after 1807, the question of descent must be determined by the territorial act of July 4, 1807, which we say passed the land to his aunts upon the side of his father, and not to the brothers of the half-blood under whom defendants claim. As to that portion, viz., one half, which came to Louis directly and immediately by descent or succession from his father, J. B. Vifvarenne, there can be no doubt that the brothers of the half-blood, Charles and Toussaint, were " excluded from the inheritance" by the 12th section of the act of 1807, as not being " of the blood" of said J. B. V. (1 Terr. Laws, 130, 131 ; Childress v. Cutter, 16 Mo. 44.) As to that portion of the estate which, upon the death of J. B. Vifvarenne, passed to François, and finally to Louis, the half-brothers are excluded wholly from inheriting it, not being " of the blood" of J. B. Vifvarenne in the sense of the 12th section of the act of 1807. This exclusion of those " not of the blood" of the ancestor; is not restricted to an exclusion of those only who are not of the blood of the immediate ancestor. All are excluded who are not " of the blood" of the ancestor from whom the estate originally came. (4 Kent's Com. 404 n. ; Lewis v. Gorman, 5 Barr, 164 ; Maffit v. Clark, 6 W. & S. 258 ; Hart's Appeal, 8 Barr, 32 ; Bevan v. Taylor, 7 S. & R. 397 ; Hartman's Estate, 4 Rawle, 39 ; 5 Watts, 113 ; Brewster v. Benedict, 14 Ohio, 358 ; Stewart's lessee v. Jones, 8 Gill & Jo. 1.)

*W. L. Williams* referred *arguendo* to the following authorities : 4 Whart. 259 ; Paine, 457 ; 1 Spear, 225 ; 7 Wheat. 59 ; Prest. on Abstr. of T. 383 ; 11 Pet. 41 ; 7 S. & R. 129 ;

4 Wash. C. C. 356 ; 9 Watts, 28 ; 10 id. 141 ; 8 id. 78 ; 3 Whart. 538, 55 ; 3 S. & R. 291 ; 10 id. 303 ; 2 Johns. 230 ; 1 Barr, 296 ; 9 Humph. 762–771 ; 1 Mass. 483 ; 4 id. 416 ; 7 id. 381 ; 1 Calif. 581 ; 12 N. H. 9.

LEONARD, Judge, delivered the opinion of the court.

This is a suit to recover possession of a forty arpent lot of ground, now in the city of St. Louis, originally granted to Lirette in 1769, and sold by him in 1774 to John B. Vifvarenne. The title of both parties is derived from Vifvarenne. The plaintiff's claim from the last surviving child, Louis Vifvarenne, by conveyances from the descendants of his two surviving paternal aunts, his next of kin of the blood of his father ; and the defendants derive their title from three half-brothers of Louis Vifvarenne, children of the mother, by Jacques Marechal, her second husband, insisting that the half-brothers succeeded to the whole lot as heirs to their mother and half-brother, one or both, to the exclusion of the paternal aunts.

The questions discussed involve the law of property between husband and wife as it stood here in 1777 when the marriage contract between J. B. Vifvarenne and wife was entered into, the Spanish law of second marriage, the law of successions down to the American law of descents and distributions, introduced by the territorial act of 1807, and the proper construction of the twelfth section of that act. The defendant raised other questions in reference to the statute of limitations, and the presumption of title proper to be made under the circumstances of the case.

We remark that the case involves a large amount of property, and that the questions discussed and to be decided depend upon a foreign system of law quite different from that to which we were bred, and with which, of course, we have very little familiarity. These questions, too, spring out of the transactions of a foreign race of men, the French inhabitants of this city, whose manners and customs as well as institutions, both

legal and social, were very different from our own. We have therefore approached the case with a corresponding distrust in the correctness of the conclusions to which we should come. But it was our duty to decide, and having given to the subject the most deliberate and attentive consideration that we are capable of, we proceed now to state, as briefly as possible, our opinion, without however claiming for its correctness that deference and respect that the place from which it is pronounced would otherwise entitle it.

The marriage contract between J. B. Vifvarenne and his wife, Genevieve Cardinal, was dated 5th August, 1777, Vifvarenne being then the owner of the lot in question. The husband died in 1781 or '82, leaving surviving him his wife and two children of the marriage, Louis and Francis. The mother subsequently married J. Marechal, and died about the 2d of November, 1792, leaving surviving her three children of this marriage. The children of the first marriage, Louis and Francis Vifvarenne, died many years ago, without any descendants, leaving surviving them their three half-brothers, the source of the defendant's title, and two paternal aunts, from whom the title on the other side comes.

1. We begin with an inquiry into Madame Cardinal's title, alleged to have been required by force of the marriage contract, and the first question that meets us at the very threshold is, what law prevailed here then? the customary law of Paris, which the French colonists brought with them to Louisiana, as their right under their king's charter; or had that law been at that time superseded by the law of the new sovereign?

In 1816, the supreme court of Louisiana decided, in Beard v. Poydras, 4 Mart. 367, that the Spanish law was introduced into the province of Louisiana by the Spanish authorities, shortly after O'Reilly's proclamation issued in 1769, upon taking possession of the country, and that it came, if not by the mere legal force of that instrument, at least by the practical adoption of it which followed immediately upon the accession of the Spanish authorities to the government of the coun-

try. Mr. Jefferson insisted, in the celebrated Batture case, (2 State papers—public lands 1,) that this proclamation only changed the civil organization and the form of judicial proceedings, and that the French law still continued in force in reference to the civil rights of the inhabitants. However, that opinion it seems has not prevailed, the opinion of the supreme court of Louisiana having, we believe, been generally recognized and acted upon, not only in that state but here also. Indeed, in the present case, the appeal is made by both parties, as if by common consent, to the Spanish law of successions and of second marriages, for the purpose of ascertaining the rights of the parties; and some of these rights accrued only a few years after the date of the contract.

2. We assume then that the Spanish law was prevailing here as early as 1777, and that law, it will be seen, would not allow parties to introduce by contract a foreign law to regulate affairs, no matter how unimportant; and with much greater reason would they be prohibited from introducing a foreign law to regulate the property relations of husband and wife, a matter everywhere, under every system of law, of the first importance, and never left unprovided for.

In the Partidas, (3 Tit. 14, law 15,) it is said: "If the laws of jurisprudence of another country, over which our authority does not extend, should be appealed to, we order that in our dominions they shall not be received as evidence, except in disputes arising between individuals of such foreign country or contracts made there." In Bourcier v. Lanux, 3 Mart. 581, the question was as to the validity of a contested sale of community property, and as the sale was valid by the French law, and the parties, by their marriage contract, which was made in Louisiana after the accession of the Spanish government, had submitted themselves to that law, it became necessary to decide the very question now before us, and the court held that under the Spanish law, then in force in Louisiana, it was not competent for parties, by special agreement, to introduce a foreign law for the regulation of the conjugal community, and there-

fore, as the sale lacked the necessary Spanish solemnities, it was void, no matter how it might be under the French law. Indeed, this is a principle of universal jurisprudence, and almost of necessity adopted and acted upon in every civilized community. No one can fail to see the great uncertainty and confusion that would prevail where such things were allowed and generally put in practice. There is a special provision in the present written code of Louisiana, allowing parties, about to marry there, to regulate their mutual rights of property according to the laws of any other State of this Union ; and no one supposes that if this contract were to be executed here to-day between competent parties that it would confer upon either the rights of property that would exist under it by the French law. What then, in 1777, was the Spanish law of husband and wife, in relation to the property of each other, present and future ? What changes could the parties make in it by express agreement ? And what changes were in fact made in the present case in reference to this property by the contract given in evidence ? The Roman law must be looked to as the original of the Spanish law upon this subject, although, of course, it has been greatly changed in the long lapse of years, both by usage and by the written laws of the Spanish sovereigns. There, husband and wife, were considered in reference to each other's property as distinct persons—each one enjoying and exercising, in his own name, all the rights of ownership over what belonged to him. The marriage union itself did not confer upon either party the property, or any rights in the property, of the other. The husband was bound to support the wife during the marriage and was entitled to her earnings, and on his death she was allowed a provision out of his succession, not exceeding a certain proportion, for her support, if she had not property enough of her own for that purpose. Of course it was competent, where a marriage took place, for the parties and their relations and friends to make gifts to the spouses on account of marriage, and these were governed by laws peculiar to such transactions ; and the parties themselves were also at

17—VOL. XXII.

liberty to make any mutual agreement with one another in reference to their property, present and future, and for its administration during the marriage, and distribution when the marriage union came to be dissolved.

There does not seem to have been any conjugal community of goods in the Roman law, and the *institution* of ganancial property, or the community of gains, found in the Spanish law, as incident to the relation of husband and wife, is, we are told, one of the few institutions for which that law is not indebted to Roman jurisprudence, although even this is said not to be supported by the unanimous assent of writers, some of whom insist that among the ancient Romans, as far back as Romulus and Numa, all property acquired during the marriage was ganancial or common. It seems also to have been even of modern growth in Spain, for we are told that no mention is made of it in the Partidas. Custom gave rise to it, and the first recognition of it by the "*lex scripta*," is said to be the notice taken of it in L. 17, Tit. 2, Lib. 4, Del Fuero Juzgo. (Institutes of the Civil Law of Spain, by Aso and Manuel, translated by Judge Johnson, of Trinidad, and found in White's Compilation, book 1, Tit. 7, note 43.) There does not seem to be any controversy (or, indeed, ground for controversy) as to the character of the Spanish customary conjugal community in relation either to the property that goes in it, the manner in which it is administered during the marriage, or as to how it is distributed when the marriage is dissolved. We will refer, however, to some authorities in reference to this matter, and begin with the explanation of certain terms used in the Spanish law at the time of the Partidas, before the Spanish customary community had been established.

Dowry, or *dote*, "is that which the wife gives the husband on account of marriage, and is a sort of donation made with a view to his maintenance and to the support of the marriage;" and, "*arras*, is that which the husband gives the woman on account of marriage." 1 Partidas, 507 and 508. "Although they put each other into possession (of these donations), yet

the husband ought to remain master and have control of the whole, and receive the fruits in general, as well of that which the wife has given, as of that which he had given himself, for the maintenance of himself, his wife and family, as well as for the proper support of the marriage." 1 Partidas, 514. Paraphernalia is "all the estate and things, whether movable or immovable, which the wife retains separately, and which are not comprehended in the dowry." 1 M. & C's. Partidas, 523.

In the Institutes of the Civil Law of Spain, before referred to, the rules of this customary community are very fully explained, and we make several short extracts from book 1, Tit. 7, chap. 5. "The right to ganancias is founded in the partnership which is supposed to exist between the husband and wife, because she bringing her fortune (*capitales*) in *dote*, gift and paraphernalia, and he his in the estate and property which he possesses, it is directed that the *gains* which result from the joint employment of this mass of property or capital be equally divided between both parties."

" Ganancial property is all that which is increased or multiplied during marriage. By multiplied is understood all that is increased by onerous cause or title, and not that which is acquired by a lucrative one, as inheritance, donation, &c."

From all which it is inferred,

" 1st. That what the husband or wife brings into the marriage, his or her own peculiar property, or acquire during it by lucrative cause or title, does not come into partition.

" 2d. That the property acquired during marriage, by purchase, sale, or other onerous cause or title, does come into partition."

From the first principle it is inferred, 1st, "that dote, arras, marriage gift and paraphernalia, are not ganancial property, or property subject to partition or division."

From the second principle it is deduced, 1st, " that the fruits produced from all these sums (*capitales*) gained and improved during the marriage, come into partition."

It will be seen by reference to these authorities, that this Spanish community is not a community of the existing property of the spouses, but a community of gains, acquisitions, profits, made during the marriage, like the ordinary community of the Roman law, and the modern partnerships of the commercial world—into which whatever is put by the partners, goes in as capital and is refunded before the profits are declared; that the administration of its affairs is given to the husband to the exclusion of the wife, the gains to be applied to the support of the family, and that upon its dissolution the capital put in by each partner is restored, and the residue (the gains), after the payment of the debts, equally divided between them; and such, we believe, is the view of this matter always heretofore taken in this court.

It was competent, however, for the parties to alter, by their agreement, the provisions of the legal community; they were at liberty to create a conventional one, different from that ordained by the law; and it is insisted that they have done so, and that this is a community of all the property of the spouses present and to come, in suchwise, that upon its dissolution all belongs to them, both that put in and that afterwards acquired, like the ganancials of the Spanish community, and must be divided in like manner.

3. The contract is, we understand, in the usual form of a French marriage contract. The first provision declares that the future spouses shall be "one and common in all goods movable, and acquisitions immovable, according to the ancient custom established in the colony, to which the said parties submit themselves by reason of the present contract." And this, we are told, is the very language in which the custom of Paris describes the community of goods which is instituted by that law upon the mere fact of marriage. A subsequent clause in the contract—the clause of "*ameublissement*" as it is called—provides, that "the future spouses take each other with the property and rights to them now belonging, and such as may happen to come and belong to them hereafter, whether by suc-

cession, gift, legacy or otherwise ; which property, from which side soever it may come, shall wholly enter into the community without any reserve ;" and this we are told has the effect, by the custom of Paris, of converting the lot into a movable, for the purpose of the contract, and carrying it, as such, into the community, with all the incidents annexed by the " custom" to the movables of the parties.

It is then argued that the French conjugal community differs both from an ordinary partnership and the Spanish community of husband and wife, in the distribution that is to be made of its effects upon a dissolution.   We are referred to the 229th article of the custom of Paris, for the rule that " after the death of one of said parties, the property of the community is divided in such manner that the half of it belongs to the survivor, and the other half to the heirs of the deceased ;" and are told that Le Brun, a French writer, after examining, on principles of natural equity, the question whether property brought into the community of husband and wife, should be taken back upon its dissolution, and stating the conflicting opinions of other writers, remarks in favor of the negative opinion, that " usage has confirmed this so absolutely for our communities *between spouses*, that no commentator has found any difficulty in respect to it."   Now, admitting all this to be true, the vice of the argument is, that it assumes either that the customary law of Paris was the law here when the contract was made, or, if not, that the parties introduced it by their agreement.   It may be conceded, that if the parties had expressly provided that every thing that entered the community should be divided as profits equally between them, that provision would have been effectual.   But that is not done here. The parties have not provided how the partition shall be made by any words expressive of that intention taken by themselves, and without reference to some custom or law upon the subject. They have agreed " to be one and common in their movables," and that " their immovables shall also enter into the community ;" and if they had stopped there, these clauses must have

been construed by reference to some custom or system of law, or entirely disregarded as too indefinite to be carried into execution. This is the case with all contracts expressed in general terms. They must be understood and interpreted by reference to some law, or altogether fail of effect. The counsel for the defendants were fully aware of this, and felt that they must resort to some system of law in order to ascertain the effect of these clauses. The contract may be sufficiently explicit upon its face, without reference to any thing external, to carry the lot into the community; but there are no words in it that fix the character of the community, in reference to the matter now in controversy—the distribution of its effects when it comes to be dissolved. Those, too, who framed this formula of a marriage contract, were aware of this, and therefore made the parties expressly refer to the law or custom that was to govern their community. If the words here used for that purpose must be understood as referring to the existing law of the province, they are lawful, although perhaps superfluous, and will be effectual; but if they refer to the custom of Paris, it is nothing other than an attempt to introduce a foreign law here for the purposes of this contract, and can not prevail. The French law is a sealed book to us in reference to this matter, and the appeal to it is made in vain.

We pursue this subject no further. We are satisfied, and the result is, that Madame Cardinal took no interest in the lot under the marriage contract at the death of her husband, and this is the conclusion to which the court came when the case was last here, although it is now placed on somewhat different grounds.

We do not stop to inquire into the effect of the special donation of six hundred livres, made to the wife. If she thereby became a creditor of the husband, even with a security upon his estate, and this right passed to her succession, it of course can only be exercised in a suit between proper parties, and not in a controversy between purchasers of a lot in the husband's succession, claimed on one side from the husband, and upon the

Cutter v. Waddingham.

other side from the wife. If the wife's succession had any such demand, it is enough here that it has not been transferred to these defendants, and they of course can not exercise rights that belong to others.

4. For the Spanish law of succession we must look also to the Roman law upon this subject, to be found in Justinian's celebrated 118th novell, which has become, as it were, the law of the civilized world, on account, we may suppose, of its expressing the general sentiment of mankind in reference to the distribution of a man's property after his death. The great difference between the Roman and the English common law of descents is, that the former looked alone to the intestate, and called his kindred to his succession according to their proximity of relationship, the nearer excluding the more remote, without any reference to the source from which the property was derived. The common law, proceeding upon feudal reasons, after the descendants of the last owner were exhausted, looked to the source from which the property came, and by its sixth canon, adopted, as Blackstone tells us, as a rule of evidence to carry out the preceding canon in favor of the blood of the first purchaser, excluded all the collateral kindred of the last proprietor that were not of the full blood of the intestate. Again, the Roman law, still proceeding upon the same principle, called the three principal lines of kindred to the inheritance in the order of natural affection : first, lineal descendants, then lineal ascendants, and lastly, collaterals ; while the common law, upon the same feudal reasons, excluded the lineal ascendants. The civil law, therefore, paid no regard to the line from which the property came, nor to quantity of blood, except in the case of brothers and sisters of the whole blood and their descendants, who took before and to the exclusion of the brothers and sisters of the half-blood.

In all these particulars the Spanish law appears to have corresponded substantially with the Roman law—calling, first, descendants, then ascendants, and, lastly, collaterals ; making the same distinction between brothers and sisters of the whole

and the half-blood, and paying no regard to the line from which the property came, except in the single instance of a deceased brother, leaving both paternal and maternal goods, and half-brothers and sisters on both sides.

Applying these rules to the present case, if Francis Vifvarenne died under the Spanish law, leaving no descendants but his mother, and brothers both of the whole and of the half-blood, his mother succeeded to him to the exclusion of all the brothers; and if Louis Vifvarenne afterwards died under the same law without descendants, or ascendants, leaving brothers of the half-blood only, and paternal aunts, the brothers of the half-blood succeeded to the exclusion of the paternal aunts. In reference to the order in which the three lines of kindred are called to the succession, it is to be observed, that the Roman law made an exception in favor of brothers of the full blood of the children, whom it admitted as co-heirs with the ascendants, a privilege, however, not extended to the brothers of the half-blood. But it is assumed, in this case, that the Spanish law made no such distinction in favor of brothers of the full blood, and however this may be, under the view we have taken of the case, the result here would be the same under either rule.

5. It was the Roman law of second marriages, adopted also into the Spanish law, that a forfeiture was thereby incurred to the surviving children of the first husband of all the property that came to the survivor of the deceased spouse. The forfeiture extended to all that came either immediately or through an intestate succession to a deceased child of that marriage; it accrued immediately upon the second marriage, so as to vest the property from that moment in the children, although the woman retained the usufruct during her life; it went to the children of the deceased parent as children, and not to them as heirs; and, finally, it embraced only such things as came to her by a lucrative title, and does not extend to any thing that she derived from husband or child for an onerous cause. Under the Spanish law this forfeiture was incurred by the wife only when she was left a widow over twenty-five, the age of Roman majority.

The questions discussed in this part of the case have been confined to the character of Madame Cardinal's title to the lot, supposing she had acquired an interest in it, under the marriage contract, and to the character of Louis Vifvarenne's title to the part that his brother Francis succeeded to from the father, upon the supposition that this interest descended to the mother and was afterwards forfeited by a second marriage. The first question is already disposed of by our opinion in reference to the effect of the marriage contract, and the other will be better considered in connexion with that part of the case that relates to the proper construction of the law of 1807, in reference to what must be considered a title " by descent, gift or devise," within the act. We may remark here, however, while upon the law of second marriage, that it sufficiently appears from what has been already said, that it is not a title by immediate descent from the father to Louis, although it should be considered as derived remotely from the father through the brother and mother. (Domat's Civil Law, part 2, book 3, tit. 4, secs. 1 and 2, from 3431 to 3443.)

6. The act of 1807 was the first American law of descents introduced here ; it superseded the Spanish law of succession, and was a complete scheme, which provided for the whole subject and left nothing to be supplied by any other code. It was the work of men familiar with the common law and strangers to the Roman law, and was no doubt adopted by our territorial lawgivers from the written laws of the older states of the Union, and not constructed here with any special reference to the existing law of this country.

The words of the 12th section are : " There shall be no distinction in the distribution of any intestate's estate between kindred of the whole or half-blood, unless when the inheritance came to the said person so seized by descent, devise or gift, of some one of his or her ancestors, in which case all those who are not of the blood of such ancestors shall be excluded from the inheritance."

The previous sections provide for descendants—for father

and mother, brothers and sisters, and husband and wife.    The 13th section contains a general provision for all posthumous children ; and then follows the 14th section, calling to the inheritance when there is neither widow nor lineal descendants, nor father or mother, nor brother sor sisters, or their descendants, the next of kin in equal degree.    And the defendants insist that the effect of the 12th section is merely to postpone the brothers of the half-blood to those of the full blood, and not to exclude them entirely in favor of more remote kindred ; that the provision is confined in its operation to the preceding parts of the act, so as only to effect a repeal of the Spanish preference given to full brothers over half-brothers, and to exclude the common law rule of exclusion from being applied to them, and that it does not extend over the whole statute, providing in the specified cases new stocks of descent, whose blood is to inherit when the lineal descendant of the last owner are exhausted.

The section embraces two distinct provisions : 1. That in the matter of descents there shall be no distinction between the full and the half-blood, except in the cases there specified ; and 2. That in those cases, that is, when the estate comes to the intestate by " descent, devise or gift of some one of his ancestors, all who are not of the blood of such ancestor shall be excluded." The first provision is sufficiently explicit, and was probably quite superfluous ; the statute, having provided a complete scheme of descents and directed what kindred should inherit, without making any distinction on the score of quantity of blood or double relationship ; none of course existed ; all are brothers and sisters, whether they be of the whole or of the half-blood, and the proximity of relationship is the same, whether the parties derive their blood from the same single ancestor, or from the same pair of ancestors.    The effect of the clause no doubt would be, if necessary, to exclude from this law of descents not only the Spanish rule of preference between brothers of the full and of the half-blood, but also the common law rule of entire exclusion.    It was, however, quite unnecessary for either purpose, although it was

no doubt aimed, in the state where the statute was originally constructed, at the common law rule of exclusion, and inserted only out of the abundance of caution.

The other provision of the section is effective in the construction of the statute. When the estate comes by descent, devise or gift, from an ancestor, none shall inherit who are not of the blood of that ancestor. This is not the Roman or Spanish law of preference between brothers of the whole and of the half blood, nor the common law rule of exclusion, but a new canon prescribed by the law given for this new scheme of descents. It is a general provision, extending over the whole statute, and regulating all the cases that may arise, to which it is applicable. What reason is there for limiting it to the first degree of collateral kindred? Such a construction is not warranted by the words used nor by the context; and it would impute to the law-giver the folly of merely repeating what had already been declared in the preceding part of the section, and result in rendering the whole section without any real effect in the operation of the statute. There can not, we think, be any doubt in the matter. Wherever the case that is provided for occurs, none can inherit who are not " of the blood" of the ancestor ; and the words, " of the blood," exclude those only who have none of the blood, without reference to proportion or quantity. Those, however, such as have none of the blood are entirely excluded ; and then those " of the blood" who stand next in degree of proximity, are, in reference to this inheritance, the next of kin, and take as such. If, therefore, the lot came to Louis Vifvarenne by descent, devise or gift of his father, his half blood brothers are entirely excluded, and his paternal aunts are his next of kin, and inherit, if he died after the law took effect.

Other questions, however, still remain. Does the expression, " come to (him) by descent, devise or gift of some one of his ancestors," limit the acquisition to a proximate and immediate descent, devise or gift from such ancest r directly to the intestate? or does it include a descent, devise or gift, which

can be deduced mediately from any ancestor, no matter how remote, who was the first purchaser to the intestate? The defendants insist, that it looks only to the immediate descent; and the plaintiffs, that it has reference to the origin of the title in the first purchaser, and only requires that the heir should be of the blood of that purchaser. As to the half of the lot that Louis Vifvarenne took by descent immediately from his father, there is no difficulty. The father was not only the first purchaser, but the ancestor from whom it came by immediate descent, and the half-brothers not being of the blood of the fathers, the paternal aunts inherit as next of kin, as to this half. But the question is important as it regards the other half that descended to François, and thence to his mother, and was afterwards either forfeited by her to Louis Vifvarenne, on her second marriage, or passed on her death to all her children of both marriages, each taking one-fourth.

This question was in the Supreme Court of the United States, in the case of Gardner v. Collins, (2 Pet. 58,) upon a clause in the Rhode Island statute of descents, very similar in its language to our statute. The case was ably and fully argued, and the opinion of the court delivered by Judge Story. He states the question in the case to be, 1st, whether the words " of the blood," include the half or exclusively apply to whole blood;" and, 2d, whether the words of the statute, " come by descent, gift or devise from the parent or other kindred of the intestate," mean an immediate descent, &c., or include a descent, &c., which can be deduced from or through any ancestor who was the first purchaser to the intestate; and the opinion of the court was, " that the words ' of the blood' comprehended all persons of the blood, whether of the whole or the half-blood ; and that the words, ' come by descent, gift or devise from the parent or other kindred,' &c., mean *immediate* descent, gift or devise, and make the immediate ancestor, donor or devisor the sole stock of the descent."

He remarks, " It is true that in a sense an estate may be said to come by descent from a remote ancestor to a person

upon whom it has devolved through many intermediate descents. But this, if not loose language, is not that sense that is ordinarily annexed to the term. When an estate is said to have descended from A. to B., the natural and obvious meaning of the words are, that it is an immediate descent from A. to B."

And again : " The cases cited at the bar do, however, demonstrate that in those states where similar language is used in their statutes of descents, the expression has been uniformly construed to mean immediate descents, gifts or devises, unless that construction has been overruled by the context."

We are entirely satisfied with the reasoning by which the court reached its conclusions ; and there is nothing in the words or context of our statute to induce us to put a different construction upon them, or to depart from what seems to be the usual interpretation put upon similar language in the statute of other states. We are accordingly of opinion, that the person referred to in the act as the new fountain of inheritable blood, is the ancestor from whom the property came to the intestate by immediate descent, gift or devise.

If, then, Louis Vifvarenne inherited from his brother or mother the half of the lot that first descended to François, they, both mother and brother, constitute new stocks of descent in relation to this property, and the half-brothers being of the blood of both, are not excluded from this inheritance. But if he acquired it by the forfeiture incurred by the second marriage, the plaintiffs insist that this is a title by gift from the father within the meaning of the act. We have construed the statute with reference to the law that prevailed here at the time it was passed, and looking only at substance, without any regard to form, have treated a Spanish title by succession from an intestate as a title by descent, within the meaning of the law ; and if we could consider this title as substantially an immediate gift from the father to his son Louis, it would be sufficient to constitute him a new stock of descent as to this part of the lot also. It is true, the father was the original owner of the property, and it is from him that this title may be

said to have been ultimately derived, and that, too, without any value paid or received. Yet it was François and not Louis that was immediately indebted to the father's bounty for this part of the lot. He permitted it to descend to his mother, and the title of Louis Vifvarenne accrues through a forfeiture imposed upon the mother by law. It is to the law then that Louis may be said to be indebted for the property. It is given to him, it is true, as the surviving child of the first marriage, because it came to the mother from the father through a child of the same marriage, and the law directed that the forfeiture it imposed as a penalty upon the second marriage, should accrue to the surviving children of the deceased husband. This forfeiture, however, is not a condition to which the father originally subjected the property, so that those who take under it may be considered as substituted by the terms of the original transaction as objects of the donor's bounty, in the place of the first donee, but is a penalty existing under the law, and therefore subject to be changed or established by law at any time before rights actually attach by reason of a forfeiture. We conclude, therefore, that if the mother forfeited to Louis Vifvarenne what she inherited from François, this was not a title in Louis by the gift of the father, and therefore, as to this interest, the brothers of the half-blood, who are his next of kin, succeed to the exclusion of the paternal aunts.

We do not think the circumstances of this case were such as to entitle the defendants to the instruction they asked as to the presumption of title.

7. In reference to the statute of limitations, we only remark, at present, that, although the possession of part of a connected whole may be and is for many purposes considered the possession of every part of it, yet we are not prepared to concede that these contiguous lots could, under the circumstances, so far as as they have been disclosed, be considered a single tract, to which this rule would be applicable for the purposes of the statute of limitations ; and, therefore, if Mullanphy built upon one of the lots and extended the enclosure about the

house over upon this lot, accidentally, through mistake or ignorance of the boundaries, and without any design of taking possession of it, this is not a possession within the meaning of the statute of limitations ; although the actual detention, "*pedis possessio*," exists, there is wanting the intention on the part of the possessor, which is necessary to constitute a civil possession.

8. We remark, further, that we are by no means ready to yield to the doctrine that one who has taken possession of a small proportion of a large lot of ground of the character and situation of the present one, under a deed, not of the lot, but merely of whatever interest the grantor may be found to have in it, has, without any th'ng more, a possession extending over the whole lot, within the meaning of our law of limitations.

The result of this opinion is, that the judgment must be reversed, and the cause remanded, to be retried in conformity with it ; and the other judges concurring, it is so ordered.

Scott, Judge.   Whether this case is to be regarded as subject to the Spanish law, or to be governed by the custom of Paris, will not materially vary its result.   Whether the property, if ameubled, would, after the dissolution of the community, be governed by the Spanish law or the custom of Paris, is a question which was not argued, nor, from the turn the case has taken, is there any necessity for my opinion in relation to it.   It seems that, by the custom of Paris, property ameubled was subject to the law of second marriages.   Ferriere, in his introduction to the practice, says, "l'ameublissement est sujet a l'edit des secondes noces."   Whilst concurring in the opinion, in other respects, I do not wish to be understood as giving my views whether this contract was to be governed by the Spanish law or by the custom of Paris.

A motion for a rehearing, in this case, was made by plaintiff's counsel and overruled.

*Reasons for a rehearing presented by R. M. Field.*

The sum of the decision is understood to be that as early as 1777, the date of the marriage contract in question, the body of the Spanish law had been introduced into the district of Illinois, of which St. Louis was then a part ; and that the contract appeals to a foreign law as the rule to regulate the rights of the parties, contrary to the express prohibitions of the Spanish law, and is therefore inoperative.

As the points decided were not discussed, nor even suggested at the bar, and as they seriously affect the rights of the parties to this suit, and may become the means of disturbing a great many titles, it is deemed not improper for counsel to present the grounds of the motion for a rehearing somewhat more fully than is usual in ordinary cases.

I. It becomes important, according to the opinion of the court, to ascertain when the Spanish law was introduced among the French inhabitants of the Illinois, so as to abrogate and render null their established forms of contracts.  If we are able to say *when* this was done, we ought to be prepared to show *how* it was done.  It might be expected that in a case of a cession by one friendly power to another, a change in the whole body of the laws of the ceded country would be preceded by some public act of state promulgated to the people.  But it is admitted on all hands that there was no such act on the part of the Spanish authorities that by its own force worked this change of law, in any part of Louisiana.  The proclamation of O'Reilly of 25th November, 1769, did not profess to supersede the whole existing body of the French law.  It abolished the old municipal government and erected another in its stead. The articles annexed to the proclamation are confined to matters of municipal and police regulation.  The instructions prepared by Urristia and Rey, and published along with the proclamation, comprise only six sections, five of which relate only

to proceedings in courts of justice and to punishments for crimes ; one briefly explains the forms of testaments and the rules of succession. Not a word on the subject of private contracts appears in these instructions. They were prepared for the purpose of communicating elementary instruction on certain heads of the Spanish law, in order to pave the way for the introduction at some future day of the whole body of Spanish jurisprudence. The proclamation and instructions may be found at large in American State Papers, vol. 1, miscellaneous, p. 363, *et seq.*

As this proclamation plainly did not by its terms abrogate the great body of the French laws, it became a question in what manner the Spanish law came to be, as in fact it did become, the controlling rule in Lower Louisiana. The prevailing opinion seems to be that the use of Spanish forms in legal proceedings that followed the proclamation, led to the introduction of the whole Spanish law ;—in other words, the proclamation led to the use, and the use, in the course of time, introduced the Spanish law, to the entire exclusion of the former system. This is the account of the matter given by Judge Martin, in his history of Louisiana. He says that by usage the Spanish law gradually and imperceptibly supplanted the French, so that the precise time when the transition from the one system to the other became complete, can not be fixed. (2 Martin, 8-14.)

The Supreme Court of Louisiana reasoned upon the subject in the same way, in the case of Beard v. Poydras. It held that the Spanish law came into Lower Louisiana by usage consequent upon O'Reilly's proclamation. The case involved the mere question of the *status* of a person depending on facts that occurred subsequently to 1785. The case is undoubtedly of authority to show that the Spanish law was in force in Lower Louisiana at that date ; but it falls far short of deciding that the same law had been introduced into the district of Illinois eight years before.

On the part of the defendants it is insisted that O'Reilly's proclamation did not extend to the district of Illinois, and that,

18—VOL. XXII.

so far from there being any adoption of the Spanish law in this district in the matter of contracts, the usage, up to the date of the contract now in question, was all the other way.

The country of the Illinois, embracing the territory on both sides of the Mississippi river, north of the mouth of the Ohio, was originally settled by the Canadian French. Kaskaskia is said to have been founded in 1682 by LaSalle, on his return from the discovery of the mouth of the Mississippi. This fact has been questioned; but it is unquestionably true that this settlement and several others in the Illinois existed in a flourishing condition full twenty years before the foundations of New Orleans were laid. During the course of the French and Spanish dominations, this country was under a government distinct and separate from that of Lower Louisiana. Its government was indeed subordinate to the latter, just as the latter was subordinate under the French to the government of New France, and, under the Spaniards, to the captain general of Cuba. On the dissolution of the French company of the west in 1732, the king appointed Perier governor of Louisiana and D'Artaguette lieutenant for Illinois. The latter was succeeded by La Buissioniere, and he in his turn in 1751 by the Chevalier Macarty. The last remained in command until the cession of the province. (1 Monette, p. 276, 296.) All these lieutenants held commissions directly from the king. Immediately after the surrender of the eastern part of the Illinois to the British, in 1765, captain St. Ange, a subaltern of Macarty, acting as it may be presumed under the orders of his superior, came over the river and took command of the post at St. Louis. He remained in command until the advent of the Spanish governor, in 1770; and although his grants out of the royal domain have been decided to be inoperative, his general administration as civil commandant is believed to have been strictly legal.

When Spain took possession of the province in 1769, Piernas was appointed lieutenant governor of the Illinois district. From this time forward there is an unbroken series of lieutenant governors for the Illinois district, holding their commis-

sions directly from the crown. Their style of office, up to 1798, was "*Lieutenant Governeur des etablissemens des Illinois.*" In the last named year this style was changed to "*Lieutenant Governeur de la Haute Louisiane.*" The general powers of these officers in the administration of the public affairs of their district was as great as those of the governor general, subject, however, to revision by appeal to the latter officer. (Stoddard's Louisiana, p. 250, 275.)

The proclamation of O'Reilly makes no mention of the Illinois district. The motive for the changes effected by the proclamation are declared in the preamble to be the forcible resistance opposed to Spanish authority the year before by the people of New Orleans and its vicinity. No such opposition was offered by the people of the Illinois. Rious, with a party of soldiers, came to St. Louis as early as 1768, and took possession for the Spanish crown, without the slightest resistance on the part of the inhabitants. He remained here a year and was hospitably entertained. (See Primm's Address at St. Louis celebration in 1844.)

Soon after the date of the proclamation, O'Reilly addressed to the commandant at St. Louis long instructions touching the government of Illinois. An imperfect abstract of this document is given in Gayarre's history of Louisiana, under Spain, p. 23. No allusion is made to the proclamation, nor to any actual or proposed change in the laws of the district. It is certainly extraordinary that so important a matter as the total subversion of the whole body of the laws under which the people of Illinois were living, should have been passed over in silence in this communication of O'Reilly.

In February, 1770, O'Reilly published his regulations in respect to grants of land. They will be found at large in American State Papers, vol. 1, miscellaneous, p. 376. In terms, they extend throughout the province. But Stoddard expressed the opinion that they had no force in Illinois, partly because Illinois is not named in the regulations, and partly for the reason that the lieutenant governors, who must have known

the extent of their own powers, practically disregarded them, of which he cites several instances. (Stoddard, 273.)

On the 3d of November, 1770, just five days after O'Reilly left New Orleans to return to Spain, Unzaga, the governor general of Louisiana, issued his own proclamation reciting that frauds had been practiced in the sales of negroes, immovables and real estates, and therefore ordering and decreeing that " no person shall henceforth sell any negroes, plantations, houses, or any kind of sea-craft, except by a deed executed before a notary public, to which shall be annexed the certificate of the registrar of mortgages ; that all other acts made under any form shall be null and void," &c. This proclamation was to be promulgated with beat of drum, and a copy sent to all the posts. The proclamation will be found entire in the appendix to Gayarre's history, p. 631. This proclamation certainly was never in force in Illinois, as has been decided repeatedly by this court and the Supreme Court of the United States. If the court will recur to page 69 of the printed record, it will see that the plaintiff's principal title paper of 1774 was not executed according to the forms prescribed by Unzaga, and, according to the terms of the proclamation, it was of no effect. But this proclamation is not cited for the purpose of proving the invalidity of that title paper. It is brought to the notice of the court to illustrate the great powers claimed and exercised by the Spanish governors, and to show that proclamations issuing from the officers of Lower Louisiana were not regarded as extending to Illinois.

The practice and usage at St. Louis, subsequent to O'Reilly's proclamation, appear in the archives in which many of the marriage contracts were deposited. An abstract of all the contracts there preserved has been prepared and is now submitted to the court. This abstract shows that from the accession of Piernas, up to the date of the contract in dispute, nineteen marriage contracts were entered into before Piernas and Cruzat. Of these, eleven adopt precisely the formula of the one in dispute, and six of the others bear plain marks of their origin in

the French law.   Only six are in the Spanish language.   Four
of these are verbal translations of the French formula of the
contract in dispute.   Of the remaining two, one (that of Mar-
tin Duralde, the Spanish surveyer general), creates no conven-
tional community, and the other (that of Sylvester Labadie),
seems to have been prepared with an eye to both the Spanish
and French law.   It plainly, however, treats the French law as
being at that time the prevailing system, for it carefully re-
stricts, by express stipulation, the community to the acquets
and gains made during the marriage.

It is manifest, from this abstract, that, in the matter of
contracts, there was not as early as 1777 any adoption of the
Spanish law at St. Louis ; but, on the contrary, that, by con-
sent of governors and governed, it was excluded.

The testimony of Brackenridge, the historian, is to the same
purpose.   In his history of Louisiana, p. 241, he says : " The
Lieutenant Governor, who resided at St. Louis, was the comman-
der of the militia, and had a general superintendence of the
public works and property ; but I do not know the exact extent
of his powers.   The laws of Spain were in force here, but it
does not appear that any other had been in practice besides those
relating to lands and the municipal arrangements.   Laws regu-
lating civil contracts are so intimately interwoven with the
manners of a people, that it is no easy task to separate them.
*Here, la coutume de Paris, the common law of the French
colonies, was the system by which their contracts were gov-
erned.*"   If, on the whole, it should be regarded as doubtful
whether the Spanish or the French law was in force at the date
of the contract in question, the presumption ought, in reason,
to be in favor of the existence of such a state of things as
would uphold the contract, rather than of such as would render
it of no effect.   And this presumption is much strengthened by
the circumstance that the contract was executed in the chamber
of the government, and in the presence of governor Cruzat,
Judge Labuxiere and Mr. Perrault, gentlemen who understood

the true state of the law at that day much better than any of the present generation.

II. Taking it for granted now that the Spanish law was in force to its fullest extent at the date of the contract, it is to be considered whether there really be any rule in the Spanish law that renders the contract inoperative, so far as the defendants seek to give it effect. The matter must be determined in the same way as if the contract came to be judged in Madrid.

The law of the Partidas, cited in the opinion of the court, is admitted to do no more than lay down a rule of universal jurisprudence. The rule is acknowledged everywhere that laws have no extra-territorial operation. They are never admitted in another state as having any force *proprio vigore*.

Furthermore, it is conceded that the citizens of one state can not, by any form of agreement, introduce into it the laws of another state, *as laws ;* in other words, to be obeyed, as expressing the will of a foreign sovereign. These principles belong to universal jurisprudence, for they flow of necessity from the nature of sovereignty and of government. But these principles fall far short of excluding a reference to foreign laws, when such reference becomes necessary to ascertain the meaning of a contract. The first duty of a court, in judging a contract, is to ascertain the intention of the parties, and the last to declare whether the ascertained intention be consistent with the law.

Manifestly the contract in question has but one meaning the world over. The rules of interpretation by which that meaning is to be arrived at are the same, whether those rules are applied by a French, Spanish, or American court. It becomes a different question when the lawfulness of the ascertained intention is inquired into. Here the local law is supreme, and all other laws have no effect.

The difficulty in the present case seems to arise from losing sight of the distinction between the instruments of evidence and the rules of law. The defendants do not appeal to the *custom of Paris* as furnishing the rule of law by which the validity of the contract is to be tested, but as supplying the means, and

the only means by which the intention of the parties can be ascertained.

By the French and Spanish law, in all cases, and by the English law, with rare exceptions, parties to contracts are at liberty to adopt any forms of expression to signify their intentions. They may refer to any document, paper, law, statute, ordinance, custom or usage, domestic or foreign, and the thing thus referred to becomes a part of the contract, with the same effect as if its terms were incorporated into the contract in words. This is familiar learning.*

It is understood to be conceded in the opinion of the court, that if the parties had copied the words of the 229th article of the custom of Paris into their contract, these words would then have expressed an intention to which the Spanish law would have given effect. But it is manifest that, under the rule just mentioned, this has been in substance done by the apt words of reference contained in the contract.

Let it be supposed that the stipulation in the contract in question had been expressed in this form : " The said parties are to be one and common in all property, according to the terms of a certain parchment writing kept in the Châtelet at Paris, containing 362 articles, and entitled *La Coutume de la Prevote et Vicomte de Paris*." And suppose that the writing thus referred to had been produced in court : could it be made a serious question, whether the writing, with its 229th article, was to be taken as part of the contract? Would the whole effect of such a reference be destroyed as soon as it turned out that a people on the other side of the Atlantic had adopted that parchment writing as their public law ?

It was held by the Supreme Court, in the case of Cutter v. Childress, admitted by the plaintiff's counsel in the argument of this case, and not now controverted in the opinion of the

---

* Such references, as is well known, are in constant use, not only in private agreements, but in the most solemn acts of state, in public statutes and in the entries of formal judgments of courts of justice. In the early legislation of Vermont, there were several instances in which the legislature adopted statutes of Connecticut by their titles only, declaring that they should be the law of Vermont *as they stood on the Connecticut law book*.

court, that by the words in the contract, "*the ancient custom established in this colony*," the parties pointed to the terms of that parchment writing just spoken of.

It is conceded on all hands that under the Spanish law the parties had the privilege of making their contract in the French language. From this simple privilege every thing that the defendants claim on this point, follows as a necessary consequence.

It is an established rule of interpretation that when technical words are used in an instrument, they must be construed according to the meaning which they have in the art or science from which they are borrowed. This rule is recognized by all courts, and is applicable to all languages.

Now the contract in question is full of these technical terms, borrowed from the French law. The words *conquets, douaire, prefix, preciput*, are of this description. To the ear of a judge of Spanish or English law alone, they are mere gibberish. By the light of the French law, their meaning is plain. He who, in expounding this contract, lays aside the French law as a sealed book, will put away the only interpreter by which the meaning of its terms can be known.

What is true of particular words may be predicated of clauses. Take the clause of *ameublissement*. In the light of the English law it has no sense. In the light of the Spanish law it is nugatory. With the aid of the French law, its meaning and force become apparent. As the clause is technical, the parties will be presumed to have used it in the sense which it has in the French law, from which it was borrowed.

But this rule of interpretation is not confined to words and clauses. It is applicable to the whole instrument. If, in taking up the marriage contract, and examining it as a whole, by its parts and its four corners, we recognize it as a formula devised under a particular jurisprudence to accomplish particular purposes, we must have recourse to that jurisprudence to learn the purposes to be accomplished, and in this way become acquainted with the real intention of the parties expressed in the contract.

The practical application of this rule of interpretation to the present case would result in this, as the expressed intention of the parties, that all the property of the parties to the marriage contract was carried into conjugal community in suchwise that on the dissolution of the community the property was to be divided between the survivor and heirs of the first deceased, by moieties. It is understood to be conceded, in the opinion of the court, that the parties intended by their contract to bring about this result; and that the result, when brought about by express contract, is repugnant to no rule of the Spanish law.

There are undoubtedly inconveniences attending the interpretation of contracts by reference to a foreign law with which our courts are not familiar, but these inconveniences fall mainly, if not entirely, upon the parties. As they have referred to that law as expressive of their intentions, they must show by evidence the terms of the law, just as they are required to produce any instrument or writing which, by like reference, they have made a part of their agreement.

In this connection, however, it is proper to remark that there is an inaccuracy in calling the custom of Paris a foreign law. Strictly speaking, it is a domestic law repealed. In 1770, it had been in force at this place, as part of the Illinois district, full three quarters of a century. Supposing it to be then repealed, it could not, in 1777, the date of the contract, be called a foreign law in any other sense than as our revised code of 1835 is now a foreign law. And it is conceived that our courts are bound to know and take notice of the custom of Paris in the same manner and to the same extent as of any other of our repealed codes. The parties, therefore, were not required to prove the custom of Paris as matter of fact on the trial.

The views that have been suggested, it is believed, are fully sustained by authority.

There has been a great variety of opinion among jurists as to the particular law that should govern the rights of property between husband and wife in cases where there was no marriage

contract. Some hold it to be the law of the matrimonial domicil, others of the future or actual domicil, and others still of the *situs* of the property. These different opinions are cited and commented upon by Story, Conf. Laws, 143, *et seq.* Where, however, a marriage contract has been entered into, there has been no diversity of opinion—all jurists agreeing that the contract is operative everywhere. (Story, 159, *ad fin*m.*)

It must be admitted, however, that the rule which gives effect to a marriage contract everywhere, does not meet the difficulty suggested in the opinion of the court. The objection in the case at bar is that the contract is invalid, because it refers to a foreign law, and therefore it can not be known what the contract is until the foreign law is known, and that is a sealed book. The objection is obviously one of mere form.

In France, before the revolution, a part of the provinces was governed by the civil law, and was called *pays du droit ecrit.* The remainder of the provinces was governed by particular customs, and was called *pays coutumiere.* In the customary provinces, with one exception, (Normandy,) conjugal community existed. In the provinces subject to the written law, a legal community did not exist, but, as in the Spanish law, it might be introduced by contract, and modified at the pleasure of the contracting parties. It was in like manner lawful for the parties to modify by contract the legal community existing in any of the customary provinces. (See Pothier, Traite Com. article *preliminaire.*) In this respect, therefore, France and Spain were equally liberal. Now, Ferriere, in his *Science des Notaires*, p. 364, has given the formula of a marriage contract by which parties, domiciled in a province of the written law, may adopt the rule of community prevailing at Paris. It is conceived in general terms, stipulating for a community, " *suivant et au desir de la communauté de Paris.*" The same writer, at page 373, gives a like general formula for the parties domiciled in Normandy, who may chose to adopt the custom of Paris. It is plain, from these examples, that the distinc·ion between referring to a law by its name or title, and setting

forth its terms at large, is a subtlety that has altogether eluded the notice of French lawyers.

The English courts have dealt with this subject in a spirit of enlightened liberality, a striking example of which is furnished in the very recent case of Duncan v. Cannon, decided in the court of appeals during the last year. (31 Eng. Law and Eq. Rep. 443.) The case was this: A Scotch gentleman married an English lady in London. A marriage contract between the parties was executed at London, by the terms of which the husband was to have " a conjunct fee and life rent" in the property of the wife. The married couple went to Scotland to reside. In a few years they removed to England, where the husband embarked in business and subsequently became bankrupt. A controversy arose between the wife and the assignees in respect to the husband's rights in her property under the contract. There was no direct reference in the contract to the law of Scotland; but the master of the rolls laid hold of the circumstances that the contract was in Scotch form, and the husband had a Scotch domicil, as sufficient evidence of the intention of the parties in that respect. He accordingly received proof of the Scotch law and interpreted the contract by that law. From this decision there was an appeal; and the court above, without hearing argument for the appellees, affirmed the judgment. Lord Justice Bruce, in giving the opinion, said : " It was, I think, conceded at the bar, (but however this may have been, I consider it to be clear from the Scotch form, the expressions and the nature of the contract, and the husband's Scotch domicil at the time when he entered into it, a domicil which he does not appear at that time to have intended to change, and which continued at the time of the marriage,) that the contract must receive the same construction and produce the same effect as it would have received and produced if it had been prepared and signed in Scotland, if the domicil of the wife had then been in Scotland and the marriage had been solemnized in Scotland. The contract, therefore, must be construed by the law of Scotland or with reference to that law."

In another part of the same opinion, the learned Lord Justice said: " The expressions of this contract are expressions with which the English law is not familiar, which it does not indeed understand. They are foreign. It knows nothing of *conjunct fee* and *life rent*—nothing of an express provision for children, being no provision at all for children. The interpretation, coming as it must from Scotland, tells us the meaning of the terms used."

It will be observed that the doctrine of this case goes much farther than what is claimed by the defendants in the present case. There the judges went out of the contract to find the law by which it should be interpreted. In the present case, the parties have in the contract expressly furnished the rule of interpretation. There the judges declared that the validity of the contract must be tested by the foreign law. Here the parties are content that their contract, when ascertained, shall be judged by the domestic law.

The following cases, though not deciding the precise point now under consideration, serve to show the readiness with which English judges resort to foreign law, when such a reference is necessary, to learn the intention of contracting parties : Faubert v. Turst, 1 Bro. P. C. 129 ; Anstruther v. Adair, 2 Mylne & K. 513 ; Este v. Smyth, 18 Beav. 112 ; Guepratte v. Young, 4 De Gex & Smale, 217.

In the case of Le Breton v. Miles, (8 Paige, 262,) Chancellor Walworth, following the example of the English courts, had resort to a foreign law for the interpretation of a contract made by the parties in reference to that law. In that case it appeared that the parties, being domiciled in the state of New York, made a marriage contract reciting that they intended to remove to France, and declaring that " the law of community is the rule under which we understand ourselves as marrying." The contract was in the French language, but was executed in New York, and the marriage took place there. The parties never did in fact remove to France, and a controversy arose as to the effect of this contract on property in New York.

The chancellor held that it appeared by the recital that the parties contracted in reference to the law of France, and he took means to ascertain that law and gave effect to the contract accordingly. A superficial reader of the report of this case might suppose that effect was given to the contract because the parties expressed an intention of removing to France ; but on a careful examination, it will become manifest that this circumstance is referred to only as showing what particular law of community was in the minds of the parties. The parties stipulated for a community, but they did not in terms declare whether it should be the community of the French, Spanish or Canadian law. There was a doubt as to the community intended. The expressed intention to remove to France solved the doubt. It is plain that the chancellor did not mean to say any thing quite so absurd as that two citizens of New York, by the mere recital of their intention to go abroad, acquired a privilege, above all other citizens, of violating the principles of universal jurisprudence. The case at bar is obviously much stronger than the one just quoted. The court has no need to grope about in search of a law by which to construe the contract. The parties have set down the rule for interpretation in plain words on the face of their agreement.

The courts of New York have, in other cases, freely referred to foreign law, where it became necessary to ascertain or effectuate the intention of contracting parties. (See Decourche v. Savetier, 3 J. C. R. 190 ; De Barante v. Gott, 6 Barb. 494 ; Crosby v. Berger, 3 Edward's Ch. R. 538.)

The case cited from Louisiana, (Bourcier v. Lanuse,) is not regarded by the defendants as really deciding any thing adverse to the doctrine for which they contend. On the contrary, it illustrates the very distinction on which they rely. In that case there was a marriage contract adopting the custom of Paris. An alienation of the community property was made by the husband in a form good by the custom of Paris, but invalid by the Spanish law as wanting the formalities required by that law. The court decided that an agreement to submit to the

custom of Paris could not dispense with the solemnities prescribed by the Spanish law in the alienation of property. The conclusion was correct. No one would suppose at the present day, under our law, that parties here could, by any form of agreement, dispense with the rules that a deed is requisite for the conveyance of real property, and that a privy examination of a married woman is necessary to render her conveyance effectual. The Louisiana judges did in truth no more than declare the maxim of universal jurisprudence, *locus regit actum.* It is perhaps superfluous to repeat that the defendants in the present case admit that the intentions of the parties to the contract, when ascertained, ·can be carried out only in the event that they are found to be consistent with the local law.

Diligent search has been made for an adjudged case, in which it has been held that a contract became inoperative because it referred to a foreign law. No such case has been found, and it is believed that none exists in the books.

It is well known that commercial contracts containing such references are of every day occurrence. Take the common case of a promissory note payable in a foreign currency; the value of such foreign currency can never be known without knowing the foreign law by which it is established. Take the case of an obligation for money with interest *after the rate allowed by the British law.* What shall be done? Shall the creditor have no interest at all, or shall the debtor be compelled to pay more than five per cent., which would be found to be the rate allowed by British law, if we were permitted to look into it? There would be no end of citing instances of the like kind occurring in the common business of life, but it is not deemed necessary to pursue the subject farther.

III. Supposing now that the Spanish law was in full force here at the date of the contract in question, and that parties by that law were prohibited from making any reference to a foreign law under pain of nullity, it is to be considered whether the contract in the present case can not be upholden on the ground that the custom of Paris became here, under the Span-

ish rule, a valid local custom. In Spanish jurisprudence, custom was regarded as having all the force of an express law. The requisites to its validity are explained in 1st Partida, tit. 2, law 5. This law, in Moreau & Carlton's abridgement, is in these words : " By the people is understood all the inhabitants of any country or place, without distinction ; and if all or a greater part of them observe any usage for a term of ten or twenty years, with the knowledge of the sovereign and without being opposed by him, such usage will have the force of custom, if during that time there had been pronounced two uncontradicted judgments conformably thereto ; or a decision declaring the existence of such a custom, after it had been disputed. Usage, to have the force of custom, ought moreover to be reasonable, not contrary to the law of God, the empire or natural law ; nor to have been established through error : for otherwise it would be an abuse, and could have no effect."

It might be supposed, from the terms of this law, that no custom was valid until two judgments were rendered in its favor, but such construction would be plainly absurd. Gregorio Lopez, the great commentator on the Partidas, in his 7th gloss on this law, says that the judgments mentioned in this law are put as examples of one kind of proof of the custom, and that others may be resorted to. His language is this : " Si non sit iste modus probandi sed alius, ex quo colligi possit tacitus consensus populi, non excluditur per istam legem. Illud enim, quod inducit consuetudinem, est usus et mores populi; non ergo debit arctari ad sententias tantum. Ostendit igitur ista lex unum modum inducendi et probandi consuetudinem, et per hoc non alios excludit."

White gives an extract from the Manual del Abogado that fairly expresses the Spanish law in this particular : " Custom is unwritten law that has been introduced by use. In order to be such and not vicious, it is required that the usage be that of the people or the greater part of them for the space of ten years, and that it be in harmony with the general utility. Two uniform judgments or sentences are one of the proofs of cus-

tom. . A legitimate custom has the force of law; derogates the former law that is contrary to it, and interprets the doubtful law; from whence it is said that there is a custom beyond the law, contrary to the law, and according to the law." (1 White, 360.) Escriche, in his Dictionary of Jurisprudence, says: " Custom is either general or special; general when it is observed throughout the whole kingdom — special when it is observed in some particular district. We must not confound custom with usage; usage is no more than a fact, custom is a law; there may be usage without custom, but there can be no custom without usage to accompany or precede it: usage consists in the repetition of acts, and custom arises out of this repetition. The usage leading to a custom may be proved by public writings, by the testimony of distinguished and ancient persons of the country, or by two concurring judgments upon the matter to which it relates." (Escriche, Dicc. voc. Costumbre. See also Recopilacion de leyes de las Indias, lib. 2, tit. 1, law 4, in 2 White, 25.)

It will be seen that the requisites of a good local custom under the Spanish law, are that it shall have been used by the greater part of the people for the space of at least ten years; that it should have been approved or at least acquiesced in by the public authorities, and that it should not be immoral or unreasonable. Let us test THE ANCIENT CUSTOM by these rules.

When the Spanish officers superseded the French authorities in the district of Illinois, in 1770, they found there a population entirely French, and acquainted with no other *system of* municipal law than the custom of Paris, which had been in use from the time of the first settlements, about four-score years before. The abstract of the marriage contracts in the hands of the court, shows that up to this date there were sixteen marriage contracts entered into at this place, which were deposited in the archives, and still remain there. Fifteen of these created a community in express terms, according to the custom of Paris (*suivant et au desir de la coutume de Paris*). The other does not

Cutter v. Waddingham.

name the custom expressly, but it contains the clause of ameublissement, and is thoroughly French in its character.

During the first ten years of the Spanish government, under the administration of the royal governors, Piernas, Cruzat and Leyba, there were twenty-eight marriage contracts entered into that still remain in the archives. The custom of Paris is not mentioned in any of them by name, but, with only two exceptions, they plainly refer to it by apt words of description, such as *the ancient custom, customary law*, &c. No less than nineteen adopt the precise language of the contract now in question. There are two that clearly do not adopt the custom. The one says nothing on the subject of community, and the other expressly adopts the Recopilacion of Castile. It is not deemed important to examine the abstract farther, although it will be found that the same old custom is generally adopted in the marriage contracts made during the Spanish rule, and the last, in point of date, that is found in the archives, was entered into before Stoddard, the American commandant, and is an exact copy of the formula of the contract now in question.

Confining our attention to the first ten years of the Spanish administration, as being the term fixed by the Spanish law for the ripening of an usage into a custom, it is found that more than eleven-twelfths of the marriage contracts then executed adopt the custom of Paris. This happened with the concurrence of the sovereign, for the royal officers set their hands to every one of them. The end accomplished was not repugnant to the law of God, to the public utility, or to the dictates of right reason. The case then, at all points, falls in the category of a valid local custom, under the Spanish law.

We need not be surprised at this result. The same result was brought about in another way in the other part of the French possessions in America. When the English received Canada from the French in 1764, under the treaty of cession, their first act was to extend the English law over the country by act of parliament, couched in terms less dubious than those of O'Reilly's proclamation. The Canadian French were disgusted with

19—VOL. XXII.

the change; they remonstrated against it; they persisted in petitioning the king and the parliament, until at the end of ten years the English government restored the custom of Paris under the name of the " Custom of Canada." This custom remains to the present day the basis of the jurisprudence of Lower Canada.

It is curious to mark the working of national pride and jealousy in these transactions. The English, as we have just seen, restored the custom of Paris to Canada, but took care to give it a new name. In a like temper, the Spanish government permitted the people of the Illinois district to make their contracts according to the custom of Paris; but, that the national dignity might not be compromised by the mention of the capital of a rival power, *la coutume de Paris* was turned into *l'ancienne coutume*.

IV. *It only remains* to consider the effect of the circumstance that the contract in question was entered into before the royal governor, and was sanctioned by the official *signature of* that officer.

We see that the parties intended to adopt the community established by the custom of Paris. The governor advised them that the intention was lawful; and he drew up the contract in a form to effectuate that intention. After a lapse of well nigh eighty years, we are told that the governor did not understand his business; that he ought to have written out the 229th article of the custom of Paris in words at length, instead of referring to it by words of description; in short, that the contract is bad in point of form. The contract is not invalid by reason of any immorality or unreasonableness in its terms, but because it trenches on the sovereignty of his Catholic majesty by a broad allusion to a law of his most Christian majesty.

It has just been assumed that governor Cruzat informed the parties that their intention to adopt the custom of Paris was legal. This is implied from the circumstances. Neither party could read or write. In Spanish practice, formal instruments

were to be drawn up by or under the supervision of some public officer. It was the duty of the officer to explain to illiterate parties the legal effect of its particular clauses, and the officer himself was amenable to severe penalties if he inserted any stipulation that was contrary to the laws. (1 Febrero, 177; 3 id. 417.)

Beyond all question the contract is to have the same effect now that it had when entered into. If Labuxiere and Roussel, the subscribing witnesses and brothers-in-law of Vifvarenne, had, on the death of the latter, in 1781, set up the pretension that is now brought forward by a party claiming under them, the matter would then have been judged by Cruzat, the officer before whom the contract was made. There is no difficulty in conjecturing what would have been the result. It is not denied that this court may correct the errors of governor Cruzat; but the function is a very delicate one, and ought not to be exercised, save in a case clear beyond all doubt.

The Supreme Court of the United States, in speaking of the acts of the Spanish governors, holds this language: " No principle can be better established by the authority of this court, than that the acts of an officer, to whom a public duty is assigned by his king, within the sphere of that duty, are *prima facie* taken to be within his power. The principles on which it rests are believed to be too deeply founded in law and reason ever to be successfully assailed." (Strother v. Lucas, 12 Pet. 437, and many cases there cited.)

Under the Spanish constitution of government the power of making and dispensing with the laws was vested in the king; and the power might be delegated to another at the royal pleasure. The 12th law of the 1st Partida, in the Latin version of Gregorio Lopez, says: " Imperator aut Rex in dominio suo, *vel alius ejus mandato*, potest legem condere super temporalibus." The power of modifying the general laws of the kingdom, so as to suit the condition of the distant colonies, was undoubtedly delegated to the royal governors. Upon no other

principle can the proclamations. of O'Reilly, of Unzaga, of Carondelet, of Gayoso, be upholden.

White, in his Recopilacion, (vol. 1, p. 367,) has given extracts from Solorzano's work on the political government of the Indies under Spain. They serve to show the large powers conferred on the Spanish governors; a portion of these extracts is here transcribed:

" Subjects have ho obligation to investigate or know the orders and instructions of a secret nature which are given to the viceroys, in which bounds are put to their power, for if they do not obey them, they are subject to reprehension and punishment; but what they may perform must be sustained, because they are in quality of factors or substitutes to royalty, for whose actions he who named them is accountable as having put them in that charge, which is indeed conformable to right. * * * But this, as I said, proceeds with reference to common law, and it is fit that the viceroys and governors of the Indies never cease to bear it in mind; still, as regards the municipal duties of these, the whole, or almost the whole, is left to their discretion and prudence. * * * The provinces of the Indies, being as they are so distant from Spain, it became necessary in these more than in any other, our powerful kings should place these images of their own, who should represent them to the life and efficaciously. * * * What I reckon as certain is, that the person to whom there is the greatest likeness is to the kings themselves who appoint them and send them out. * * * From which it happens that regularly in the provinces entrusted to them, and in every case and in all things which are not especially excepted, they possess and exercise the same power, authority and jurisdiction with the king who names them. * * * And all this is very right; for wherever the representation of another is given, there the true copy of that other is given; and, in general, this representation is more resplendent when the viceroys and magistrates are further removed from the masters who influence and communicate it to them—as Plutarch finely expresses it by the example of the moon, which

becomes of greater size and splendor in proportion as she removes from the sun, which is the object that gives her that splendor. * * * Much greater pains are required with viceroys for the new world, which is so much further distant from the eyes of their kings, and is composed of so many different nations and mixtures of people, and comprehends so many new provinces, in which every day there occur some new and unthought of affairs—where mutiny and sedition are contemplated—where sudden and dangerous changes are experienced—where municipal laws are not known or not found sufficient for every case ; *and if we wish to make use of the Roman code or the Castilian, these do not square with those of the country ;* and the very state of the republic is so inconstant, varied and different in itself every day, that things which yesterday might be judged and considered very straight and regular, to-day would become unjust and pernicious. * * * The first established rule and sentence is that viceroys can act and dispatch in the provinces of their government, in cases that have not been specially excepted, all that the prince who named them might or could do if he were himself present. * * *. All which is indeed conformable to the purpose for which these honorable and preëminent employments were instituted, which was, as it appears, that subjects, who live and reside in such remote provinces, may not be obliged to go and seek the king who lives so far off ; that they may have near them a substitute of his, to whom they can apply ; with whom and of whom they can treat. The lawyer Ulpiano dares to say, in an absolute style, ' that there is no case in the provinces which can not be dispatched by them ;' and the same doctrine and many examples to confirm it are taught to us by many other texts of law, civil, canonical and royal. * * * Even when they exceed their powers or secret *institutions,* they must be obeyed like the king himself, although they transgress and are afterwards punished for it."

It is impossible to read the foregoing extracts from Solorzano and doubt the ample authority of governor Cruzat to give

full validity to the contract in question, although it might not be strictly conformable to the general laws of the kingdom.

Some observations will now be submitted on the separate opinion of one member of the court to the effect that property *ameubli*, according to the custom of Paris, was subject to the law of second marriages, and therefore the result would be the same under the facts of the case, whether the rights of the parties were determined by the French or Spanish law.

1. The law of second marriages is in its nature penal, and it is supposed that the French penal laws were out of use here in 1792, when Genevieve Cardinal, the twice married woman, died, and the rights of the children, under the law of second marriages, attached.

2. It is thought to be not altogether clear that the law of second marriages ever had any force in the French colonies. The Supreme Court of Louisiana has forestalled this inquiry only as to the Spanish law. The law is in its nature wholly unfitted for an infant colony.

3. The law was no part of the custom of Paris. It was introduced into the kingdom by an edict of Francis I., A. D. 1560. The 279th article of the custom of Paris created certain disabilities in the wife marrying a second time, but that article has no bearing on the rights of the present parties.

4. By the edict of Francis I., the widow marrying a second time was required to reserve for the children of the former bed her interest in the excess of the first husband's contributions to the community above her own. The language of Pothier on the subject is this: "L'avantage, qui résulte à une femme de ce que son défunt mari a apporté de plus qu'elle à la communauté, paraît aussi, lorsqu'elle l'a acceptée, etre un avantage sujet au second chef de l'édit, pour la moietié de ce qu'il a apporté de plus qu'elle." (Traite du Mariage, 607.)

Applying the rule as stated by Pothier, it would be necessary to take an account exhibiting the value of what was brought to the community by the husband and wife respectively. Surely such an account can not be taken in this action of ejectment.

5. In another particular the French law of second nuptials was more favorable to the wife than the Spanish law. By the former law she was not required to reserve what came to her by succession from a child of the former marriage. Pothier, after stating the changes in the civil law, in this respect, says : "Nous n'avons pas admis, en pays coutumier, cette réserve des biens, auxquelles la femme, qui a convolé en secondes noces, a succédée à quelqu 'un de ses enfans du premier mariage ; quoiqu 'ils viennent du premier mari par le canal de cet enfant, elle ne les tient point de son premier mari : elle ne les tient point de son premier mariage ; le titre de succession, auquel ils lui sout échus, est un titre tout différent." (Traite du Mariage, 609.)

6. Under the construction of the territorial law of descents, adopted by the court, it is of no importance to the present parties whether the Spanish or French law of second marriages was in force here. But it may turn out to be of great importance whether the property in dispute went into the community according to the one law or the other. In truth it may so happen that one quarter part at least of this highly valuable estate may fall to the one or the other party, as this question may ultimately come to be decided by the court.

R. M. FIELD,
*of Counsel for Appellants.*